873 F.2d 1025
 29 ERC 1629, 19 Envtl. L. Rep. 20,765
 CHICAGO ASSOCIATION OF COMMERCE AND INDUSTRY, et al.,
Petitioners and Plaintiffs-Appellants,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,
and
Lee Thomas, Administrator of the United States Environmental
Protection Agency, Defendant-Appellee.
 Nos. 87-3057, 87-3074.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 9, 1988.
Decided April 28, 1989.
 
 James T. Harrington, Ross & Hardies, Chicago, Ill., for petitioners and plaintiffs-appellants.
 Michael A. McCord, Environmental Defense Sec., Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for defendant-appellee.
 Before CUMMINGS, WOOD, Jr., and CUDAHY, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 In this case we confront the consequences of an egregious failure on the part of the United States Environmental Protection Agency (the "EPA" or the "Agency") to perform what the Agency itself admits to be its nondiscretionary duty. However, because this is not a suit to compel the EPA to perform that duty, we affirm the district court's dismissal and deny the Chicago Association of Commerce and Industry's ("CACI's") petition for review.
 
 I.
 A.
 
 2
 Behind this case lies a prolonged history of foot-dragging on the part of the EPA in the face of ever-clearer mandates from Congress and the courts. The Federal Water Pollution Prevention and Control Act (the "Act"[1]) sets forth its goals in unequivocal language:
 
 
 3
 The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter--
 
 
 4
 (1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;
 
 
 5
 * * *
 
 
 6
 (3) it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited....
 
 
 7
 33 U.S.C. Sec. 1251. Amendments to the Act enacted in 1972 and 1977 established stringent requirements limiting the discharge of effluents. By 1977, direct dischargers were to apply "the best available technology economically achievable" in order to effect "reasonable progress toward the national goal of eliminating the discharge of all pollutants." 33 U.S.C. Sec. 1311(b)(2)(A), see also 33 U.S.C. Sec. 1317(a)(2). Any discharge of pollutants by direct dischargers required a permit from the Administrator. 33 U.S.C. Sec. 1342.
 
 
 8
 Indirect dischargers, who released toxic pollutants to publicly owned treatment works ("POTWs"), were also required to conform to "pretreatment" standards, in order to lessen the burden on public sewage plants and to better ensure that the goals of the Act were met. 33 U.S.C. Sec. 1317(b)-(c). However, to avoid redundant treatment, an indirect discharger could obtain "removal credits" from a POTW, relieving the indirect discharger of responsibility for removing any toxic material that the POTW was itself capable of removing from the waste stream. 33 U.S.C. Sec. 1317(b)(1). The removal credit provision of the Act is subject to two limitations: (1) the resulting discharge from the POTW must conform to "that effluent limitation or standard which would be applicable to such toxic pollutant if it were discharged by [the indirect discharger] other than through a publicly owned works" and (2) the indirect discharger's release of toxics to the POTW must not "prevent sludge use or disposal" by the POTW in accordance with sludge disposal guidelines mandated in section 1345 of the Act. Id. The EPA is required under the Act both to promulgate regulations establishing pretreatment standards, 33 U.S.C. Sec. 1317(b), and to promulgate regulations governing sludge disposal. 33 U.S.C. Sec. 1345.
 
 B.
 
 9
 Initially the EPA did promulgate removal credit regulations, which were amended several times prior to 1981. At that time the Third Circuit upheld the 1981 version of the regulations against challenges by both industry and environmental groups. National Ass'n of Metal Finishers v. EPA, 719 F.2d 624 (3d Cir.1983), (NAMF), reversed in part sub nom. Chemical Mfrs. Ass'n v. NRDC, 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985).[2] However, despite this vindication of the 1981 removal credit regulations, the EPA delayed the effective date of the 1981 regulations until ordered by the Third Circuit to reinstate them effective (retroactively) to March 10, 1981. Natural Resources Defense Council v. EPA, 683 F.2d 752, 768-69 (3d Cir.1982) (NRDC I ). Although the EPA did at that point reinstate the 1981 regulations, it proceeded in 1984 to promulgate and adopt a new version of the removal credit regulations, with relaxed standards for granting removal credits. 49 Fed.Reg. 31212 (1984) (codified at 40 C.F.R. Sec. 403.7) (1985).
 
 
 10
 When the 1984 version of the regulations was challenged by the National Resources Defense Council ("NRDC"), the Third Circuit ruled that the new regulations failed to meet the requirements of the Act. National Resources Defense Council v. E.P.A., 790 F.2d 289 (3d Cir.1986), cert. denied, 479 U.S. 1084, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987) (NRDC II ). The Third Circuit panel, in an opinion authored by Judge Garth, invalidated the 1984 removal credit provisions on four grounds: (1) the 1984 regulations no longer required that the POTWs and indirect dischargers together remove toxics with the same consistency required of direct dischargers;[3] (2) the 1984 regulations deleted a requirement in the 1981 regulations which mandated that removal credits be adjusted to account for the discharge of untreated sewage when sewer systems overflowed; (3) the 1984 regulations provided for withdrawal of removal credits only if a POTW's removal rate "consistently and substantially" dropped below mandated levels, a considerable change from the more stringent rule for withdrawing removal credits under the 1981 regulations;[4] and (4) the EPA had failed to promulgate new sludge regulations to comport with the 1977 Amendments pertaining to sludge.[5] Id. at 298-310.
 
 
 11
 In response to this decision, the EPA decided to continue the 1981 regulations in effect. 52 Fed.Reg. 42434 (Nov. 5, 1987). This solved the first three difficulties discussed by Judge Garth, because the 1981 regulations adequately addressed the problems of consistency rates, adjustment for sewer system overflow and procedures for withdrawal of removal credits. However, the problem posed by the EPA's failure to generate sludge regulations remained.[6] The plain language of the Act predicates any grant of removal credits on compliance with sludge regulations; in the absence of those regulations, there can obviously be no removal credit program. The Third Circuit made this explicit: "The EPA cannot, in the absence of the section 405 regulations, authorize the issuance of removal credits under section 307(b)(1)." Id. at 314.
 
 C.
 
 12
 Following the Third Circuit's decision in NRDC II, Congress took the unusual step of staying part of that decision in an amendment enacted in February of 1987:
 
 
 13
 The part of the decision of Natural Resources Defense Council, Inc. v. U.S. Environmental Protection Agency, 790 F.2d 289 (3d Cir.1986), which addresses section 405(d) of the Federal Water Pollution Control Act is stayed until August 31, 1987, with respect to--
 
 
 14
 "(1) those publicly owned treatment works the owner or operator of which received authority to revise pretreatment requirements under section 307(b)(1) of such Act before the date of the enactment of this section, and
 
 
 15
 "(2) those publicly owned treatment works the owner or operator of which has submitted an application for authority to revise pretreatment requirements under such section 307(b)(1) which application is pending on such date of enactment and is approved before August 31, 1987."
 
 
 16
 The Administrator shall not authorize any other removal credits under such Act until the Administrator issues the regulations required by paragraph (2)(A)(ii) of such Act, as amended by subsection (a) of this section.
 
 
 17
 Water Quality Act, Pub.L. No. 100-4, 101 Stat. 74, Sec. 406(e) (33 U.S.C. Sec. 1345 note (West Supp.1988)). The subsection to which this passage refers requires the Administrator to propose sludge regulations by November 30, 1986 and to promulgate them "[n]ot later than August 31, 1987." 33 U.S.C. Sec. 1345. This the Administrator failed to do, and as of August 31, 1987, the Congressional stay expired. As of the time of oral argument in this case the EPA still had not promulgated the regulations required by statute, and counsel's best guess at that time was that the proposed regulations would not be issued until April of 1989 at the earliest.
 
 II.
 
 18
 Against this backdrop, we review the facts relevant to this case. The plaintiffs, constituents of the Chicago Association of Commerce and Industry, are indirect dischargers of effluent to a POTW, the Metropolitan Sanitary District of Greater Chicago ("MSD"). In May of 1985 the MSD had applied to the EPA for authority to issue removal credits to indirect dischargers. The Third Circuit decision invalidating the 1984 regulations was issued in April of 1986, and the Third Circuit's mandate was issued following denial of certiorari in February of 1987. Also in February came the congressional stay until August 31, 1987, of the Third Circuit's decision regarding sludge regulations.
 
 
 19
 In March of 1987 the MSD renewed its request that the EPA review its application for removal credit authority, and the plaintiffs independently urged the EPA to take action before August, when the congressional stay would expire. The EPA responded to the MSD in April, and refused to take action because Congress had stayed only the portion of NRDC II that pertained to sludge regulations. Thus the other three grounds for invalidation remained. On May 28, 1987, the plaintiffs registered their dissatisfaction with the EPA's position and mentioned the possibility of a suit to compel action under section 505(a)(2) of the Clean Water Act, 33 U.S.C. Sec. 1365(a)(2).[7]
 
 
 20
 In June of 1987 the EPA announced that it would reinstate the provisions of the 1981 regulations that had been approved by the Third Circuit in NAMF, thereby remedying the defective provisions that had not been the subject of the congressional stay. MSD noted its intention to submit a revised application to conform with the newly reinstated EPA provisions as soon as the EPA issued a notice clarifying its decision. The EPA did not issue the notice when promised, and the plaintiffs filed an action in the district court on July 17, 1987, to compel the EPA to act on MSD's first application for removal credit authority. In a memorandum submitted to the district court in response to a motion for summary judgment, the Administrator stated that the 1981 regulations had actually been reinstated by the Third Circuit's decision in NRDC.[8] The MSD immediately filed a revised application and plaintiffs amended their complaint accordingly. The August 31 deadline arrived shortly thereafter; as of that time the EPA was clearly without authority to authorize removal credit programs until sludge regulations were in place.
 
 
 21
 On September 17 the EPA denied the MSD's application. On October 27, 1987, the district court granted EPA's motion to dismiss on the ground that without sludge regulations no action could be taken on the MSD's application. This appeal consolidates CACI's petition for review of the EPA's decision denying the MSD's application and CACI's appeal from the district court's decision granting EPA's motion to dismiss.[9] We deny CACI's petition for review and affirm the district court's decision, because the EPA's extreme delay in generating sludge regulations does indeed forestall any further action on the MSD's application for removal credits.
 
 III.
 
 22
 CACI makes two arguments in its briefs: (1) It argues that the MSD was eligible for and should have received removal credit authority prior to August 31, 1987, and that removal credits authorized before that time should still be currently available; and (2) Even if the EPA cannot at this time complete the process of granting removal credit authority, it can process the MSD's application in all other respects except as to sludge regulations in order to expedite the review process once sludge regulations are generated. However, before addressing the merits we first consider two threshold issues of standing and jurisdiction under the citizen suit provision of the Clean Water Act amendments.
 
 A.
 
 23
 The district court concluded that the plaintiffs, as indirect dischargers for whose benefit the removal credit program was provided, have standing to seek action from the EPA in this matter. Chicago Ass'n of Commerce and Indus. v. Thomas, No. 87 C 6353, mem. op. at 9b, 1987 WL 19166 (N.D.Ill. Oct. 27, 1987) (CACI ). This conclusion was clearly correct, cf. Allen v. Wright, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), and the EPA chose not to press the issue here.
 
 
 24
 The EPA does urge that jurisdiction is lacking because CACI failed to observe the 60-day notice requirement of section 505(b)(2) of the Clean Water Act. 33 U.S.C. Sec. 1365(b)(2).[10] Counsel for the plaintiffs gave the Administrator notice on May 28, 1987, when he warned the EPA that a citizen suit might be filed. The plaintiffs' original complaint was filed July 17, 1987, only 50 days after notice was given. However, plaintiffs' amended complaint, dated August 21, 1987, comports with the notice requirement, and it is the dismissal of that complaint that we review here.[11] We therefore move on to review the district court's decision dismissing the plaintiffs' amended complaint, as well as the EPA's action denying the MSD's application.[12]
 
 B.
 
 25
 The plaintiffs seek two alternative kinds of relief. First, they contend that the MSD should have been granted removal credit authority prior to the August 31 deadline, that the EPA's own unreasonable delay prevented the grant of authority and that the MSD is now entitled to action on its application. This assumes that a POTW that successfully obtained removal credit authority before the August 31 deadline could now continue to operate under that authority.
 
 
 26
 The plaintiffs' first argument rests on a strained reading of the "stay" provision enacted in the Water Quality Act amendment. This provision provided first that the portion of the Third Circuit decision invalidating the removal credit regulations because of inadequate provisions for sludge was stayed until August 31, 1987 with respect to
 
 
 27
 (1) those publicly owned treatment works the owner or operator of which received authority to revise pretreatment requirements under section 307(b)(1) of such Act before the date of the enactment of this section, and
 
 
 28
 (2) those publicly owned treatment works the owner or operator of which has submitted an application for authority to revise pretreatment requirements under such section 307(b)(1) which application is pending on such date of enactment and is approved before August 31, 1987.
 
 
 29
 Water Quality Act, Pub.L. No. 100-4, 101 Stat. 74, Sec. 406(e) (33 U.S.C. Sec. 1345 note (West Supp.1988)). The provision further states that
 
 
 30
 [t]he Administrator shall not authorize any other removal credits under such Act until the Administrator issues the regulations required by paragraph (2)(A)(ii) of such Act, as amended by subsection (a) of this section.
 
 
 31
 Id. (emphasis added). The plaintiffs take the position that the word "other" in this passage refers to credits for which authority was not received prior to the August 31 deadline. They argue that any POTW that received authority to issue removal credits prior to that time may continue to issue them now.
 
 
 32
 This approach comports with neither the statutory language nor the legislative intent here, and it flies in the face of the Third Circuit's mandate in NRDC II. The first category excepted under the "stay" provision comprised POTWs that already had removal credit authority. These POTWs were given a stay until August 31, 1987. The reason that Congress felt that a stay was needed for these POTWs was clearly that it believed that the POTWs could not continue to grant removal credits during the interim period in the absence of such a stay. Why? Because the grant of any removal credit under section 1317(b)(1) is expressly conditioned on compliance with sludge standards, and no POTW can comply with the standards until they have been promulgated. The Third Circuit's opinion in NRDC II explicitly recognizes this problem: "We hold ... that the EPA cannot, in the absence of the [sludge] regulations, authorize the issuance of removal credits under section 307(b)(1)." NRDC II, 790 F.2d at 314. Thus the EPA's position--that removal credits are no longer available to any POTW, including those that had received authority prior to passage of the Water Quality Act--is the correct one. Accord Armco v. EPA, 869 F.2d at 984-985 (6th Cir.1989). Even had the MSD received authority before the August 31 deadline, it would not be able to grant removal credits now.
 
 
 33
 The plaintiffs alternatively request that the EPA be forced to begin processing the MSD's application as to everything but sludge requirements, so that when the sludge regulations are promulgated the application can receive expedited treatment. The difficulty with this request is, as the district court noted, that the MSD cannot even submit a completed application until the sludge regulations are in place. The regulations governing the application process do not permit consideration of an application until it satisfies stated requirements, one of which is that every completed submission include "a certification that the granting of removal credits will not cause a violation of the sludge requirements...." 40 C.F.R. Sec. 403.7(e)(4)(v). Even were the EPA to accept the application, the very first step of the subsequent review process requires the EPA to determine whether the submission meets the pertinent requirements--again, of course, including the sludge requirements. 40 C.F.R. Sec. 403.11(b). We recognize that this "Catch-22" situation is a frustrating one, but there is no way that any action can be taken on the MSD's application until sludge regulations are produced.
 
 IV.
 
 34
 The only recourse remaining to plaintiffs is a suit that seeks to compel the EPA, at long last, to perform its admittedly nondiscretionary duty and generate the sludge regulations as mandated. That is not this suit, although we are informed that an action of that kind is now pending. See LTV Steel Co. v. Thomas, No. 88 C 2130, 1988 WL 121576 (N.D.Ill. Nov. 9, 1988). Our decision in no way reflects approval of the course of action (or, more accurately, inaction) the EPA has pursued in this area. However, we must leave to a later day the puzzling question of how to compel a recalcitrant agency to perform a duty it has repeatedly been ordered to carry out, by Congress and by the courts. Until that time, we wash our hands of the sludge problem. The decision of the district court is AFFIRMED; CACI's petition for review is DENIED.
 
 
 
 [1]
 The Water Pollution Prevention and Control Act has been amended several times, including by the 1972 amendments known as the "Clean Water Act," and the 1987 amendments referred to as the "Water Quality Act." For ease of reference we will use "the Act" to refer to the Water Pollution Prevention and Control Act as amended, and will designate the amending Acts by name when referring specifically to them
 
 
 [2]
 The Supreme Court reversal of portions of this decision did not affect the Third Circuit's determination as to the removal credit program
 
 
 [3]
 Direct dischargers were required to meet limitations 99% of the time at the time of the 1977 Amendments. The first regulations promulgated by the EPA in 1978 permitted removal credits to be granted if POTW and indirect dischargers together could achieve a 95% consistency rate. The 1981 rule, upheld by the Third Circuit, lowered this figure to 75%. However, the 1984 rule moved the consistency rate requirement still lower, to 50%, a figure which the Third Circuit understandably found inadequate: "Under the EPA's current definition of consistent removal, discharges could be above the limit for months at a stretch, so long as these above-average months were offset by below-average discharges in other months." 790 F.2d at 305. Permitting this to happen would clearly undermine the goals of the statute, for "a single concentrated discharge of a toxic pollutant can do irreparable damage," and this was the reason for instituting consistency requirements in the first place. Id
 
 
 [4]
 Under the 1981 regulations, any discharge beyond permitted amounts was considered a "significant contribution" to a violation of the discharge limits, and as such triggered action by the EPA or state that could culminate in withdrawal of removal credits upon sixty days' notice. 46 Fed.Reg. 9447; see also 40 C.F.R. Sec. 403.3(i) & (n) (1982)
 
 
 [5]
 The 1984 regulations attempted to deal with the sludge issue by using sludge requirements from other statutes to provide guidelines. 40 C.F.R. Sec. 403.7(a)(1)(ii) (1985). The Third Circuit held that this "grab-bag" approach did not "provide the comprehensive standards for sludge disposal intended by section 405(d)." NRDC II, 790 F.2d at 313
 
 
 [6]
 Neither the earlier Third Circuit decision in NAMF nor the Supreme Court opinion reviewing that decision directly addressed the sludge regulation problem. Chemical Mfrs., 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985); NAMF, 719 F.2d 624 (3d Cir.1983)
 
 
 [7]
 This section, as amended, reads:
 Except as provided in subsection (b) of this section and section 1319(g)(6) of this title, any citizen may commence a civil action on his own behalf--
 * * *
 (2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.
 33 U.S.C. Sec. 1365(a)(2).
 
 
 [8]
 The formal notice to this effect finally appeared in the Federal Register on November 5, 1987. 52 Fed.Reg. 42434
 
 
 [9]
 Thus the jurisdictional situation here is quite different from that in Armco v. EPA, 869 F.2d 975 (6th Cir.1989), a case in which the plaintiff attempted to obtain review of the EPA's failure to generate regulations through a petition for direct review of the agency's inaction (and of its Federal Register notice announcing the interim suspension of removal credits). The Sixth Circuit concluded that the proper procedure for seeking review of the EPA's failure to perform its duty was a citizen's suit in the district court rather than a petition for direct review. In the case before us, by contrast, CACI seeks both review of a distinct agency action (its denial of the MSD's application) and review on appeal from a decision of the district court
 
 
 [10]
 Citizen suits are subject to a 60-day notice requirement:
 No action may be commenced--
 (1) under subsection (a)(1) of this section--
 (A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or
 (B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.
 (2) under subsection (a)(2) of this section prior to sixty days after the plaintiff has given notice of such action to the Administrator,
 except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of sections 1316 and 1317(a) of this title.
 33 U.S.C. Sec. 1365(b). Section 1316 mandates the promulgation of regulations by the Administrator within a year of the time a category of sources is included under the statute, and delineates a procedure by which states can gain authority to enforce the standards set by the Administrator. 33 U.S.C. Sec. 1316. Section 1317(a) outlines the process through which the Administrator is to generate a toxic pollutant list and standards for effluent limitations. 33 U.S.C. Sec. 1317(a).
 
 
 [11]
 We agree with the district court that the procedure outlined in its footnote 5 (dismissal without prejudice of the original complaint, and refiling of a new complaint) would have been preferable, and we commend that procedure in future instances. See CACI, mem. op. at 11b (N.D.Ill. Oct. 27, 1987). However, "[u]nless we are to become a citadel of technicality," Soo Line R.R. Co. v. Escanaba & Lake Superior R.R. Co., 840 F.2d 546, 549 (7th Cir.1988), proliferating unnecessary and duplicative paperwork, we will not rest jurisdiction on variations of this kind
 
 
 [12]
 We review the Agency's action denying the MSD's application under 33 U.S.C. section 1369(b)(1)(F), which provides for review of the Administrator's actions regarding permits issued to direct dischargers. Here the MSD seeks a modified permit from the EPA whose terms would supercede those of its original permit granted pursuant to 33 U.S.C. section 1342(a)(1), which requires that discharge meet the requirements of sections 1311, 1312, 1316, 1317 (pretreatment standards for indirect dischargers), 1318 and 1342