**In the Matter of FORTY–EIGHT INSULATIONS, INCORPO-RATED, Debtor.**

**Appeal of MARITIME ASBESTOS CLAIMANTS.[1]**

**No. 96–3406.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 16, 1997.

Decided June 9, 1997.

---

1. We note that throughout this tangle of litigation, appellants have referred to themselves both as the "Maritime Asbestos Claimants" and the "Maritime Asbestosis Claimants." For consistency in our court, we have chosen the former.

Leonard C. Jaques, Alan Kellman (argued), Jaques Admiralty Law Firm, Detroit, MI, Dion J. Sartorio, Tressler, Soderstrom, Maloney & Priess, Chicago, IL, for Appellant.

Brant C. Weidner, Terry John Malik (argued), Dirk W. Andringa, Winston & Strawn, Chicago, IL, for Trustee-Appellee and Debtor.

Before ESCHBACH, COFFEY and DIANE P. WOOD, Circuit Judges.

ESCHBACH, Circuit Judge.

After years of producing asbestos-containing products, Forty–Eight Insulations, Inc. ("Debtor" or "Forty–Eight") began reparations by using the proceeds of its Chapter 11 liquidation to fund a trust created to pay asbestos-related property damage and personal injury claims. Appellants, the Maritime Asbestos Claimants ("the Claimants") assert a right to these funds for alleged personal injury related to the use of Debtor's products in the maritime industry. As part of the claims processing procedure, Debtor's Trustee, Thomas J. Allison, disallowed the appellants' claims to the money on the grounds that they had not demonstrated sufficient exposure to Debtor's products. To pay those claims that were allowed, the Trustee sought and obtained an order from the bankruptcy court approving an interim distribution from the Trust to allowed claim holders. Instead of fully distributing the Trust funds at once, the Trustee kept a reserve of $1.8 million to fund disputes over disallowed claims. The Claimants disputed the Trustee's denial of their claim by filing a court action, which is still pending, against

the Trustee. In addition, contending that the $1.8 million reserve would not cover their claims should they later be judged allowable, the Claimants moved the bankruptcy court to stay its order approving the interim distribution and reserve. The bankruptcy court, and later the district court, denied the stay motion. We take jurisdiction to review the district court's stay denial, and now affirm.

## I. Background

From 1923 to 1970, Forty–Eight and its predecessor corporation manufactured insulation products, some of which contained asbestos. Beginning in 1982, the Debtor ceased manufacturing operations and began to manage its assets for the purpose of defending, settling, and paying asbestos-related property damage and personal injury claims arising out of claim holders' use of Debtor's products. In April of 1985, under the weight of over 26,000 asbestos-related claims against it, Forty–Eight filed a petition for relief under Chapter 11 of the United States Bankruptcy Code. After a ten-year asset liquidation process, the bankruptcy court in May of 1995 confirmed Forty–Eight's Modified Fourth Amended Plan of Liquidation ("the Plan").

The Plan allowed for the payment of claims as follows. After the Trustee paid administrative expense claims, priority claims, and non-asbestos-related unsecured claims, the Debtor's remaining assets were to be deposited in the Forty–Eight Insulation Qualified Settlement Trust ("the Trust"), which would hold assets for the payment of asbestos-related property damage and present and future personal injury claims in accordance with the Trust Agreement. The Trust Agreement provides that the Trust funds should be distributed in conformity with the Plan, from one of two accounts: Distribution Account A, consisting of approximately $39 million, would be used to pay the allowed claims of "present claimants" (those who file claims before the bar date of November 22, 1995); and Distribution Account B, consisting of approximately $15 million, would be used to pay "future claimants" (those who file claims after the bar date).

Criteria for "allowed" claims were set out in the Claims Processing Agreement ("CPA"), which, like the Trust Agreement, was incorporated into the Plan by the bankruptcy court's confirmation order. Under the CPA, the claims processor would review each claim for validity. To show that his claim was allowable, a claim holder was required 1) to demonstrate that he was exposed to asbestos products manufactured by Debtor, and 2) to submit a medical report listing the diagnosis of an asbestos-related disease as a result of that exposure. On receiving the claims processor's recommendation, the Trustee would either allow the claim and authorize payment, or deny the claim. In the event that a claim holder's claim was initially disallowed, the Trust Agreement provided that the claim holder would be notified of the reason and given a second chance to submit evidence of exposure for reevaluation. In the event that a claim holder's claim was rejected after this second review, the claim holder could bring suit to dispute the rejection in a court of competent jurisdiction.

The Claimants here are a class of workers in the maritime industry who allege personal injury from Debtor's asbestos-containing products which they believe were used aboard vessels upon which class members worked and lived. Pursuant to the Trust Agreement and the CPA, the Claimants submitted their claims before the bar date, thus asserting their right to a portion of the Trust funds for present claimants. The Trustee twice rejected their claims on the grounds that they had not demonstrated sufficient evidence of exposure to Debtor's asbestos-contaminated products. The Claimants responded to the Trustee's second denial by filing a tort class action in Cook County Circuit Court naming the Trustee as the sole defendant. In this separate action ("the class action"), the Claimants argue that their claims should not have been disallowed because Debtor supplied its products to the maritime industry. Procedural jockeying landed the class action back in the lap of Bankruptcy Judge Barliant.[2]

**2.** The Trustee removed the class action to the District Court for the Northern District of Illi-

Meanwhile, the Trustee proceeded with his task of authorizing payment to other claim holders whose claims *had* been allowed. Under the Plan, the Trustee was required to make payment to the holders of allowed present claims by September 30, 1996. Instead of disbursing the entire balance of Trust Account A to the allowed claim holders at that time, he decided to create a reserve account to ensure that there were adequate remaining funds available to pay the costs of defending or settling lawsuits brought by rejected claim holders and to pay initially rejected claims later deemed to be allowed. The Trustee proposed to make partial, interim payments to the allowed claimants on September 30, to use the reserved funds to cover the costs of any disputed claims, and then to distribute the remaining reserved funds, if any, to the allowed claimants after the disputes were settled. In the course of discharging this duty, the Trustee sought approval from the bankruptcy court to make a $37.5 million interim distribution to those present claimants whose claims had thus far been allowed. As part of that motion, the Trustee also sought the bankruptcy court's approval of a $1.8 million reserve, the amount that would remain in Trust Account A after the proposed interim distribution.

■ On September 10, 1996, the bankruptcy court issued an order approving both the interim distribution and the $1.8 million reserve ("the September 10 Order"). The Order prompted the Claimants to make two responsive filings: 1) a Notice of Appeal of the September 10 Order with the district court; and 2) an emergency motion to stay the September 10 Order with the bankruptcy court.[3] The Claimants' stay motion expressed their concern that the $1.8 million reserve would be inadequate to pay their claims should a court subsequently find that they are entitled to payouts from the Trust. The stay motion did not expressly request that the court stay all distribution of funds

from Trust Account A—instead, it requested that the bankruptcy court order the Trustee to increase the reserve from $1.8 to $5.8 million, which they contend would be adequate to cover their alleged claims. On September 24, 1996, the bankruptcy court denied the stay motion. That same day, the Claimants renewed their stay request in federal district court pursuant to Bankruptcy Rule 8005. In an order dated September 26, 1996, the district court also refused to grant the stay. Before our court, the Claimants challenge this second denial. On September 27, 1996, we issued an order granting an interim stay pending appeal, specifically prohibiting the scheduled September 30, 1996 interim distribution and generally prohibiting the distribution of any Trust funds until further order.

## II. Jurisdiction

■ Because of the often complicated issues of jurisdiction in bankruptcy appeals, we asked the parties to brief us on whether we may review the district court's order denying the stay. Debtor questions the district court's jurisdiction to review the bankruptcy court's order, and also argues that even if the district court had jurisdiction, our court does not.

■ We begin the jurisdictional analysis with the issue of finality. If the denials of the stay motions at both the bankruptcy and district court levels are final orders, the district court and our court would clearly have jurisdiction under 28 U.S.C. § 158(a)(1) and (d), respectively. A cousin to § 1291 finality-based jurisdiction, § 158 governs the review of cases initiated in the bankruptcy court, and provides separate bases for jurisdiction at the district court and appellate court levels. Under § 158(a)(1), final judgments, orders, and decrees of the bankruptcy court are appealable as of right to the district court. Under § 158(d), courts of appeal may hear appeals from "final" orders entered by

---

nois, which then referred the proceeding to the bankruptcy court overseeing the Debtor's bankruptcy liquidation on the basis of relatedness. This case is still pending.

3. As is procedurally required under Bankruptcy Rule 8005, a motion to stay a bankruptcy court's

order must initially be brought before the bankruptcy court. Following that court's denial, the movant may renew the stay motion in the district court. *See In re Maurice,* 167 B.R. 136, 138 (Bankr.N.D.Ill.1994). The Claimants properly followed this procedure.

the district court in appeals from bankruptcy court judgments. Section 158 finality differs from § 1291 finality, however. In ordinary federal litigation, a final judgment is an order resolving all disputes of all parties, thus winding up the district court's business. 28 U.S.C. § 1291. However, because bankruptcy proceedings are often comprised of many discrete disputes, most of which come to a logical conclusion before the entire estate is settled, courts have generally interpreted § 158 finality more liberally than § 1291 finality. *See generally* John P. Hennigan, Jr., *Toward Regularizing Appealability in Bankruptcy,* 12 BANKR.DEV. J. 583 (1996) (offering a helpful review of the finality doctrine as applied in the bankruptcy context). Our court is no exception, applying finality in the bankruptcy context with a relaxed eye. *In re Gould,* 977 F.2d 1038, 1040–41 (7th Cir. 1992); *In re Powelson,* 878 F.2d 976, 980 (7th Cir.1989) (collecting cases). Under § 158, we treat as final those orders that ultimately determine a creditor's position in the bankruptcy proceeding, even though administration of the debtor's estate continues. *See In re Sandy Ridge Oil Co.,* 807 F.2d 1332, 1334 (7th Cir.1986). Even under this more relaxed standard, however, neither the bankruptcy court's order denying the stay, nor the district court's order affirming the denial, are final. The orders do not finally determine the Claimants' position *vis a vis* the Debtor's settlement Trust because the Claimants' dispute with Forty–Eight is unresolved; they must remain in court to appeal the September 10 Order and to ultimately establish their entitlement to the Trust funds. *See In re Lybrook,* 951 F.2d 136, 137 (7th Cir.1991); *see also In re Jartran,* 886 F.2d 859, 862 (7th Cir.1989) (finding no § 158 finality because "a considerable number of potential [nonministerial] disputes between Jartran and [creditor] remain[ed]"); *cf. In re Morse,* 805 F.2d 262, 264 (7th Cir.1986) (finding § 158 finality where creditor's claim was established and valued). Because the stay denials at the bankruptcy and district court levels were not final orders for purposes of § 158(a) and (d), we must explore alternative jurisdictional bases that would allow review of these interlocutory orders.

■ Our search for an alternative basis for the district court's jurisdiction is a short one. In addition to granting jurisdiction for final orders by bankruptcy courts, § 158 also gives a district court the discretion to exercise jurisdiction over "other interlocutory orders and decrees" with leave of the court. *See* 28 U.S.C. § 158(a)(3). Thus the district court may choose to take jurisdiction from interlocutory orders of bankruptcy courts. Forty–Eight acknowledges that Bankruptcy Judge Barliant's September 10 Order was an interlocutory order, but contends that § 158(a)(3) does not confer jurisdiction because the Claimants did not formally request leave to appeal. Thus, they argue, the district court (and by necessary extension our court) lacked jurisdiction. We disagree. This argument rests on a procedural foot fault that our circuit has held should not defeat jurisdiction where the district court asserts its jurisdiction by directing proceedings even in the absence of a formal grant of leave to appeal. *See, e.g., In re Jartran,* 886 F.2d at 865; *Chicago Assoc. of Commerce and Industry v. EPA,* 873 F.2d 1025, 1031 n. 11 (7th Cir.1989). Although the district court did not formally grant the Claimants leave to appeal the September 10 Order, the district court "effectively gave leave" by exercising its jurisdiction over motions practice in the appeal. *See In re Jartran,* 886 F.2d at 865.

■ Finding an alternative basis for appellate review of the district court's interlocutory order is a bit more complicated because, unlike the district court, we do not have the same discretion under § 158 to hear interlocutory appeals. 28 U.S.C. § 158(d); *In re FBN Food Services, Inc.,* 82 F.3d 1387, 1392 (7th Cir.1996). Courts of appeal have jurisdiction under § 158 only if *both* the bankruptcy and district court orders were final. *In re Szekely,* 936 F.2d 897, 899 (7th Cir.1991); *In re Morse,* 805 F.2d at 264. Nevertheless, § 158 is not the sole avenue for appellate jurisdiction over district court decisions in bankruptcy appeals. Even though § 158 is silent on appellate court jurisdiction of interlocutory appeals, the Supreme Court in *Connecticut National Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 1149–50, 117 L.Ed.2d 391 (1992), held

that 28 U.S.C. § 1292 also confers appellate jurisdiction in bankruptcy cases. We assert jurisdiction under this statute, which provides for appellate jurisdiction over "[i]nterlocutory orders of the District Courts ... granting, continuing, modifying, refusing or dissolving injunctions...." 28 U.S.C. § 1292(a)(1). We recently held that "appellate review of interlocutory orders may be obtained under § 1292(a)(1) if the order has both the effect of an injunction and has 'serious,perhaps irreparable, consequences.'" *Central States v. Central Cartage Co.*, 84 F.3d 988, 991 (7th Cir.1996) (quoting *Carson v. American Brands, Inc.*, 450 U.S. 79, 83–84, 101 S.Ct. 993, 996–97, 67 L.Ed.2d 59 (1981)). Here, the bankruptcy court (and then the district court) refused to stay the September 10 Order, which approved an interim distribution that would seriously deplete the Trust pending the Claimants' appeal. This refusal had the effect of denying an injunction by denying the Claimants' request to enjoin a substantial distribution from the Trust balance while proceedings concerning rights to that balance continued.[4] If the proposed interim distribution from the Trust is not stayed, and if the Claimants are ultimately successful in proving their claims allowable under the Plan, the balance of Trust Account A will be so depleted that the Claimants' will have little hope of receiving the same payment as other initially allowed present claimants. This possibility provides

the necessary risk of serious consequence required under *Carson*, and thus we take jurisdiction under § 1292(a)(1).[5]

## III. Merits of the Stay

▆▆▆ Having asserted jurisdiction, we now examine the propriety of the district court's September 26, 1996 order denying the Claimants' stay motion. In considering whether to grant a stay pending appeal under Bankruptcy Rule 8005, courts consider the following four factors: 1) whether the appellant is likely to succeed on the merits of the appeal; 2) whether the appellant will suffer irreparable injury absent a stay; 3) whether a stay would substantially harm other parties in the litigation; and 4) whether a stay is in the public interest. *In re 203 North LaSalle Street Partnership*, 190 B.R. 595, 596 (N.D.Ill.1995); *In re Maurice*, 167 B.R. at 138. These factors mirror the factors to be considered in ruling on an application for preliminary injunction, in which context we have more fully explained how the factors are to be applied and balanced. *See Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir.1984). Applicants for preliminary relief have threshold burdens to demonstrate the first two factors: they must show that they have some likelihood of success on the merits and that they will suffer irreparable harm if the requested relief is denied. *Id.* at 386–87.[6] If the movant

4. The Claimants' stay motion, as written, requests a mandatory injunction. Instead of asking the court to enjoin all Trust distributions, they ask the court to order Forty–Eight to create a $5.8 million reserve. However, if the interim distribution approved in the September 10 Order proceeds as planned, only $1.8 million would be left in the reserve. Therefore, the Claimants' request in essence was a request that the court enjoin Forty-Eight from distributing some $4 million of the scheduled interim distribution. The technicalities are of no moment here; either way, the court's refusal was akin to a refusal to grant an injunction.

Forty–Eight also argues that we cannot take jurisdiction under § 1292 because the Claimants improperly sought injunctive relief by motion, not by filing a separate adversary proceeding. As support, they point us to Federal Rule of Bankruptcy Procedure 7001, which defines "adversary proceeding" in part as a proceeding "to obtain an injunction or other equitable relief." We need not address this argument except to note that, even if the Claimants' course of action

was procedurally flawed, it does not now affect our jurisdiction. *See* Fed. R. Bankr.P. 9030 ("[The bankruptcy] rules shall not be construed to extend or limit the jurisdiction of the courts....").

5. Having found jurisdiction under 28 U.S.C. § 1292(a)(1), we need not address the Claimants' alternative argument that we have jurisdiction under the "collateral order" doctrine of *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).

6. *Roland* also required a threshold showing that the applicant have "no adequate remedy at law," a requirement inapplicable in the context of a stay pending appeal. *Id.* at 386. Nevertheless, the requirement that an applicant make threshold showings on irreparable harm and likelihood of success is applicable in the stay context. *See Glick v. Koenig*, 766 F.2d 265, 269 (7th Cir.1985) (requiring stay movant to make showings on the first two factors).

can make these threshold showings, the court then moves on to balance the relative harms considering all four factors using a "sliding scale" approach. *Id.* However, if the movant does not make the requisite showings on either of these two factors, the court's inquiry into the balance of harms is unnecessary, and the stay should be denied without further analysis. *See Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 361 (7th Cir.1993); *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992). Because the Claimants have not met their threshold burden to show likelihood of success, we affirm the district court's denial of the stay.

■■■■■ To meet the threshold burden on likelihood of success in the preliminary injunction context, the applicant need only demonstrate that his chance of success on the merits at trial is "better than negligible." *Roland*, 749 F.2d at 387. However, in the context of a stay pending appeal, where the applicant's arguments have already been evaluated on the success scale, the applicant must make a stronger threshold showing of likelihood of success to meet his burden. *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir.1991) (concluding that a stay movant must raise "serious questions going to the merits") (citation omitted); *see also Adams v. Walker*, 488 F.2d 1064, 1065 (7th Cir.1973) (requiring a stay movant to make a "strong" and "substantial" showing of likelihood of success on the appeal); *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C.Cir.1958) (requiring a stay movant to make a "strong" showing of likelihood of success before a reviewing court should intrude on the ordinary process of judicial administration). Thus, in the instant case, the Claimants need to demonstrate a substantial showing of likelihood of success, not merely the possibility of success, because they must convince the reviewing court that the lower court, after having the benefit of evaluating the relevant evidence, has likely committed reversible error. *Griepentrog*, 945 F.2d at 153. In addition, the procedural

posture of this case raises the threshold hurdle one notch higher—two courts, not one, have concluded that the Claimants are unlikely to succeed in winning a reversal of the bankruptcy court's September 10 Order.

■■■■■ The district court, agreeing with the bankruptcy court's earlier stay ruling, found that the Trustee indisputably had discretion under the Trust Agreement and the Plan to create a reserve of $1.8 million. Although the district court did not explicitly so state, this conclusion clearly indicates that the Claimants failed to convince the court that they made a sufficient showing of likelihood of success. Accordingly, the court refused to issue a stay of the September 10 Order. As is the case with other forms of equitable relief, a court's decision to deny a Rule 8005 stay is highly discretionary. *See In re 203 North LaSalle Street Partnership*, 190 B.R. at 596; *In re Maurice*, 167 B.R. at 138. However, we review the legal conclusion that a stay movant has met the required threshold showing of likelihood of success *de novo. See Dynamics Corp. of America v. CTS Corp.*, 805 F.2d 705 (7th Cir.1986).

The Claimants' core argument is this: they are likely to succeed in their appeal of the September 10 Order allowing the interim distribution because the Trustee erroneously set the reserve at $1.8 million instead of $5.8 million, the amount needed to cover all of the Claimants' claims at a payout equal to all other allowed claimants. It is undisputed that if each of the Claimants can eventually prove exposure to asbestos (a big "if" given their failure thus far), the reserve will only be sufficient to pay each Claimant approximately one-fourth of what the initially allowed claimants would receive should the planned interim distribution be made. By not setting the reserve to cover 100 percent of the disputed claims, the Claimants argue that the Trustee was exceeding his power under the Trust Agreement in violation of Illinois trust law and was also modifying the Plan in violation of 11 U.S.C. § 1127 by effectively "reading out" § 6.4 of the Plan, which provides that each allowed claimant must receive an equal payout.[7] Finally, the

---

7. Section 1127 allows post-confirmation modification of a bankruptcy reorganization plan only

if the modification is confirmed by the court after

Claimants argue that the court should have stayed the interim distribution order because the insufficiency of the $1.8 million reserve would render their pending class action suit meaningless, violating their procedural due process rights. Debtor counters that the Plan explicitly gave the Trustee discretion in deciding whether to establish a reserve at all, and to decide how much of a reserve was appropriate.

To evaluate these arguments, we begin with the Plan and Trust Agreement provisions in controversy. The Claimants hang their hats on § 6.4 of the Plan, which states that "Each Allowed [present claimant] shall be paid the same amount." Debtor relies on Article III of the Trust Agreement (incorporated into the Plan), which sets out the powers of the Trustee. With regard to the setting of a reserve, the Trust Agreement states, in relevant part, that "the Trustee shall have the power to take any and all such actions as in the judgment of the Trustee are necessary or convenient to effectuate the purposes of the Trust, including ... the power to ... establish reserves and accounts within the Trust deemed by the Trustee to be useful in carrying out the purpose of the Trust." The purpose of the Trust, given in § 2.02, is "to use the assets of the Trust to pay Asbestos–Related Claims in conformity with the Plan and the Settlement Agreements." The Trust Agreement also requires the Trustee to act in accordance with all Plan provisions in fulfilling his duties.

■■ A generous reading of the Claimants' briefs allows two different interpretations of their argument. One interpretation of the Claimants' position, aptly advanced by Bankruptcy Judge Barliant at the initial stay hearing, is that the Trustee had no discretion at all to set the reserve—that § 6.4 *requires* the Trustee to allocate enough money in the reserve to cover all initially disallowed claims at 100 percent equal payout, regardless of the Trustee's evaluation of the claim's merit. We must reject this argument. Article III of

the Trust Agreement clearly leaves reserve issues to the Trustee's "judgement." [8] Claimants' argument in fact "reads out" this clear discretionary grant. Leaving reserve issues to the Trustee's "judgment" necessarily implies that the Trustee has discretionary decision-making authority. If the Trustee were, as Claimants suggest, required to reserve money for *all* initially disallowed claims, the Trustee would have no decision-making role; reserves would be mandatory if even one claim was disallowed. Claimants point to no provision in either the Trust Agreement or the Plan that requires the Trustee to set a reserve in this manner, or that strips the Trustee of his Article III discretionary authority over reserves. We must give meaning to the Plan's undeniable grant of discretionary power over reserves to the Trustee.

■■■ A second interpretation of the Claimants' position, one which is at least consistent with the language of the Plan, is that the Trustee has discretion to set reserves, but abused his discretion by setting the reserve at $1.8 million, an amount insufficient to pay 100 percent of Claimants' disputed claims. Although the Trust Agreement gives the Trustee discretion over reserves, this discretion is not without limits. Under Illinois law, the law governing the Trust document here, the boundaries of a trustee's discretion on issues of trust fund management are drawn using a "prudent person" standard. *Jefferson National Bank v. Central National Bank*, 700 F.2d 1143, 1152 (7th Cir.1983). Under this standard, the Trustee may not arbitrarily choose to create a reserve or keep a reserve at a certain level; his decision must be made "considering the purposes, terms, distribution requirements, and other circumstances of the trust. This standard requires the exercise of reasonable care, skill, and caution." 760 Ill. Comp. Stat. 5/5(a)(1) (1993).

We recognize the possibility, however remote, that the Claimants may ultimately

appropriate notice and hearing procedures. *See* 11 U.S.C. § 1127(b).

**8.** In fact, the Plan does not even require the Trustee to acquire court approval prior to setting

a reserve, although the Trustee, in his exercise of reasonable business judgment, sought and obtained approval here.

demonstrate that their claims are allowable. To date, however, the Trustee has not distributed funds unequally in violation of § 6.4. Thus, we are not faced with redressing an actual violation of the equal payout provision by the Trustee; we · must only evaluate whether the Trustee's decision to set the reserve at $1.8 million was a reasonable and prudent exercise of his discretion under the relevant circumstances of the Trust. The Trustee need only disburse Trust funds to initially disallowed claim holders *if they win* in their court challenge to the Trustee's decision. The Trustee must be able to evaluate the "if"—the Claimants' likelihood of winning—in order to set a reasonable reserve. This is the key to reconciling the grant of discretion in Article III with the equal payout requirement in § 6.4 of the Plan. Section 6.4 requires the Trustee to set the reserve in a way that he believes will allow equal payout, taking into account the likelihood that a claim will be allowed. Whether the $1.8 million reserve was an abuse of discretion rests on whether a reasonable person would agree that the reserve was sufficient given the number and relative merit of disputed claims. Therefore, to establish that a stay was warranted on the argument that the $1.8 million reserve was an abuse of discretion, the Claimants need to show that not including enough money in the reserve to pay 100 percent of their disputed claims was unreasonable because the Trustee misjudged the likelihood that the Claimants would succeed in proving their exposure to Debtor's asbestos-containing products.

The record reveals that the Trustee reasonably believed that the Claimants' likelihood of eventually proving exposure was minute. First, the Trustee's decision was based on a thorough review of all the evidence of exposure that the Claimants offered. As the Plan required, the Trustee examined the Claimants' evidence of exposure not once, but twice. Using the neutral guidelines applicable to all claim holders, the claims processor and the Trustee reviewed the Claimants' evidence, which did not indicate sufficient exposure. The Trustee notified the Claimants of the disallowance, and gave them reasons why their claims were insufficient. The Claimants then had a second opportunity to present additional supporting evidence, but again were unable to sufficiently demonstrate exposure under the allowance criteria. In addition, the record reveals a significant question as to whether the Claimants would meet the criteria even if they receive a favorable ruling on their class action. Paragraph five of the Claimants' complaint in the class action states that the action was brought "for the limited purpose . . . of establishing [that] the Defendant manufactured asbestos-containing products which were used in the maritime industry aboard vessels upon which class members served, worked and lived." The Plan, however, requires more than a showing that Debtor supplied contaminated materials to the industry; it requires evidence of exposure to those materials from each individual claim holder. The class action complaint does not address exposure on an individual level. Thus, even if the Claimants would "win" the class action, *i.e.*, the court would find that Debtor supplied asbestos-containing products to the maritime industry, the Claimant class would still have to clear the hurdle of proving that each class member was exposed to the products and suffered medical consequences from that exposure.

We learned at oral argument that the Claimants and two other small groups of mariners are the only parties who have begun dispute proceedings in court, and thus are the only parties whose claims, if allowed, would need to be paid from the reserve. The reserve of $1.8 million would allow 7,500 of these claim-holders, if and only if they can prove individual exposure, to be paid in full. Claimants' argument that this reserve is an abuse of discretion is dependent on their supposition that all 27,000 mariners in the class will be successful in demonstrating individual exposure, yet the Claimants gave the district court virtually no evidence to support such a finding. Without this evidence, and in light of the Trustee's reasonable doubts concerning the Claimants' ability to prove exposure, we cannot say that the Trustee abused his discretion by setting a reserve that did not cover 100 percent of Claimants' disputed claims. The Claimants have failed to demonstrate that the Trustee's actions were outside

his powers under the Trust Agreement or that the Trustee modified the Plan by ignoring § 6.4. Accordingly, neither argument provides the strong showing of likelihood of success required for a stay to issue.

 The Claimants' undeveloped argument of a procedural due process violation is also without merit. Specifically, they claim that the September 10 Order violates their due process rights by allowing a distribution that leaves a reserve insufficient to pay its claimants should they ultimately prove exposure, rendering their right to litigate the merits meaningless. The Claimants correctly identify their class action against the Trustee as a constitutionally protected property interest. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148, 1153–54, 71 L.Ed.2d 265 (1982). However, to succeed on this claim, the Claimants must also show that they were deprived of this property interest without due process of law. *Board of Regents v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972). Here, the Claimants had, but did not take, an opportunity to comment on the Plan's grant of discretionary reserve-setting power to the Trustee. After the bankruptcy court approved the Plan, the Claimants were given notice of what evidence was required for initial claim allowance. They presented that evidence to the claims processor and the Trustee not once, but twice. Following the Trustee's first denial decision, the Claimants were informed of the reason for claim denial. The Claimants then exercised their right under § 6.4 of the Plan to receive a second evaluation of their claim. The Claimants then received an opportunity to resubmit their claims with additional substantiating documents. Pursuant to the Plan, the Trustee met with the Claimants and reviewed the additional verifying affidavits offered by the Claimants in support of a finding of exposure. Following this second review, the Trustee again denied their claims for failure to show sufficient evidence of exposure to asbestos. The Claimants then moved on to the next level of process, filing a claim in state court as allowed by § 6.6 of the Plan. In the meantime, the Claimants had several other audiences with the federal courts on the issue of the proposed reserve. First, the Claimants were involved in bankruptcy court hearings on the Trustee's motion for approval of the interim distribution. Transcripts of the hearings confirm that the basis for the Trustee's decision was discussed. After the Claimants' objections were overruled and the September 10 Order issued, they petitioned for a stay of the Order. In litigating the stay, the Claimants again participated in hearings before both the bankruptcy court and the district court, additional forums which provided a check on the inextricably intertwined issue of the Trustee's decision to deny the claims. *See In re Compensation Under the Longshore and Harbor Workers' Compensation Act*, 889 F.2d 626, 631–32 (5th Cir.1990).

The Claimants advance their due process argument without recognizing the process they did receive or telling us why these processes were constitutionally deficient. Instead, they state only a conclusion, void of case support, that they have been denied due process. Like Claimants' other arguments, their conclusory due process argument does not establish the strong showing of likelihood of success required to obtain a stay.[9] Because the Claimants have failed to meet their threshold burden on this factor, we affirm the district court's stay denial without addressing the other three stay factors.

## IV. Conclusion

Although we affirm the district court's stay denial on the basis that the Claimants have not made the required strong showing of likelihood of success on the merits, we are mindful that our conclusion does not take into account further factual evidence to the contrary that may be presented during the appeal before the district court. Our decision on this interlocutory appeal of the stay denial, therefore, does not conclusively decide the merits of the Claimants' appeal of the September 10 Order. *See Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 620 (7th Cir. 1982), citing *Hunter v. Atchison, T. & S.F.*

9. The Claimants' remaining arguments on this issue are also without merit.

*Railway Co.*, 188 F.2d 294, 298–99 (7th Cir. 1951).

Accordingly, the stay entered by this court on November 8, 1996, is now vacated and dissolved and the order of the district court is AFFIRMED.