PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 15-1253

———————


In re: REVEL AC, INC., ET AL.,
Debtors


IDEA BOARDWALK, LLC,
Appellant


———————


Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 1-15-cv-00299)
District Judge: Honorable Jerome B. Simandle

———————


Argued February 6, 2015

Before: AMBRO, SHWARTZ, and KRAUSE, Circuit Judges

(Opinion filed: September 30, 2015)

Jeffrey A. Cooper, Esquire  (Argued)
Jonathan I. Rabinowitz, Esquire

Barry J. Roy, Esquire
Rabinowitz, Lubetkin & Tully
293 Eisenhower Parkway, Suite 100
Livingston, NJ   07039

       Counsel for Appellant
       IDEA Boardwalk LLC

Michael Viscount, Jr., Esquire
John H. Strock, Esquire
Fox Rothschild
1301 Atlantic Avenue
Midtown Building, Suite 400
Atlantic City, NJ   08401

Jason N. Zakia, Esquire (Argued)
John K. Cunningham, Esquire
White & Case
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131

       Counsel for Appellees/Debtors
       Revel AC, LLC; Revel Atlantic City LLC;
       Revel Entertainment Group LLC;
       NB Acquisition LLC; SI LLC

Stuart J. Moskovitz, Esquire
819 Highway 33
Freehold, NJ   07728

       Counsel for Appellee
       Polo North Country Club Inc.

Richard W. Riley, Esquire
Duane Morris
222 Delaware Avenue, Suite 1600
Wilmington, DE   19801

Sommer L. Ross, Esquire
Duane Morris
30 South 17th Street, United Plaza
Philadelphia, PA   19103

     Counsel for Appellees
     Wells Fargo Bank NA;
     Wells Fargo Principal Lending LLC

---

## OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

We seldom focus on how to balance the four factors that determine whether to grant a stay pending appeal despite the practical and legal importance of these procedural standstills.  So we take this opportunity to do just that.[1]

## I.   BACKGROUND

---

[1]  Because of the time-sensitive nature of this appeal, we were unable to give a full rationale for our ruling on the date we entered judgment in favor of Appellant IDEA Boardwalk, LLC, reversing the District Court's denial of its stay request. This opinion does so.

In April 2012 Appellee Revel AC, Inc., *et al.* ("Revel") opened a 47-story, 710-foot-high resort-casino (which we refer to simply as the "Casino") in Atlantic City, New Jersey. The Casino was marketed as "a state of the art gaming and resort facility unlike any other in Atlantic City." Its cost: $2.4 billion, making it the most expensive hotel ever built in Atlantic City. *See* Tom Corrigan, *Atlantic City's Revel Casino Files for Bankruptcy Again*, Wall Street J. (June 19, 2014, available at http://www.wsj.com/articles/atlantic-citys-revel-casino-files-for-bankruptcy-again-1403212625). As part of its plan for the Casino, Revel entered into a lease with Appellant IDEA Boardwalk, LLC ("IDEA") to run two upscale nightclubs and a beach club. The lease was for a 10-year term (with a 15-year option to extend) and obligated IDEA to contribute $16 million of the $80 million projected cost of construction of the clubs (in addition to its monthly rental payments as lessee).

Unfortunately the Casino's $2.4 billion price tag was no indication of its future success. A sluggish Atlantic City economy and the Casino's inability to turn a profit were too much for Revel to overcome. After a failed sale attempt, Revel's cash flow problems made a (second) trip to bankruptcy the only option.[2] It filed a so-called "Chapter 22" on June 19, 2014.[3] As part of its first-day

---

[2] Revel had previously filed under Chapter 11 of the Bankruptcy Code in March 2013 and confirmed a plan of reorganization in May of that same year.

[3] A number of Revel's subsidiaries also filed for bankruptcy. They include Revel AC, LLC, Revel Atlantic City, LLC, Revel Entertainment Group, LLC, NB Acquisition, LLC, and SI LLC. For convenience, we refer to Revel and its subsidiaries jointly and severally as "Revel."

filings, Revel asked the Bankruptcy Court for permission to sell its assets free and clear of all liens and interests (which includes leases) and to approve bid procedures to allow that sale as quickly as possible. The Court approved the request and set August 7, 2014 as the auction date.

### A. Revel's Attempt to Sell the Casino in Bankruptcy

The request to sell the Casino "free and clear" raised the ire of its tenants—among them, IDEA.[4] Its concern was that, were the sale as proposed to occur, the value of its lease would turn to zero notwithstanding its initial $16 million investment. To protect that investment, IDEA filed objections to the proposed sale. It made clear that its intent was not to scuttle the sale, but to block Revel from selling the Casino stripped of its lease. Citing 11 U.S.C. § 365(h), IDEA argued that, notwithstanding a rejection of that lease, it can retain its possessory interest, as the subsection provides that a

> lessee may retain its rights under such lease . . . for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.

11 U.S.C. § 365(h)(1)(A)(ii). Alternatively, IDEA contended that even if § 365(h) did not secure its interest, § 363(f)—the

---

[4]  The other tenants include: (1) the so-called "Amenity Tenants" (made up of a group of companies that operated an array of food, liquor, and retail establishments within the Casino); and (2) ACR Energy Partners (the provider of water and power to the Casino).

Code provision that allows for the sale of an asset free and clear[5]—was of no use to Revel, as it couldn't satisfy any of the five alternative conditions necessary to trigger a sale under its strictures.

Notwithstanding the objection of IDEA, Revel continued the auction process and embarked on a lengthy marketing campaign, communicating with over 200 potential investors. Unfortunately the market for Revel's assets proved thin, and, because not a single qualified buyer came to the table, the Bankruptcy Court postponed the August 7 auction.

About a month later, on September 2, Revel closed the Casino's doors and barred its tenants, IDEA included, from accessing the Casino premises. When that happened, IDEA gave written notice that (1) it intended to continue operating its beach club and one of its nightclubs notwithstanding the Casino's closure and (2) it expected Revel to continue to abide by the terms of its lease. More specifically, IDEA asked that Revel "continue to honor its obligation under the Lease to provide uninterrupted utility service." Am. Compl. ¶ 96, *IDEA Boardwalk, LLC v. Revel Entm't Grp., LLC*, No. 14-01756 (Bankr. D.N.J. Sept. 26, 2014), ECF No. 6. To put its plan into action, IDEA met with representatives from

---

[5] Subsection 363(f) provides that a debtor can sell its assets free and clear of "any interest" (here a lease) if (1) applicable nonbankruptcy law so permits, (2) the interest holder consents, (3) the interest is a lien and the price at which the debtor's assets are being sold is greater than the value of all the liens on its property, (4) the validity of the interest is in *bona fide* dispute, or (5) the interest holder, whether in a legal or equitable proceeding, could be compelled to accept a money judgment for its interest. 11 U.S.C. § 363(f)(1)–(5).

various city agencies to secure approval to operate on a stand-alone basis and sued Revel to enjoin it from "failing to provide utilities and parking" and engaging in any other conduct "that prevents IDEA from operating the HQ Dayclub and HQ Nightclub in accordance with the terms of the Lease." *Id.* ¶ 118. Furthermore, and to assert its rights under § 365(h), IDEA sought a declaratory judgment that, "under applicable law[,] the Lease is a lease of non-residential real property as that term is defined and governed by 11 U.S.C. § 365 and, as such, is entitled to all relevant statutory protections, including, but not limited to[,] 11 U.S.C. § 365(h)." *Id.* ¶ 144(a).[6]

## B. Polo North Becomes "Stalking Horse" Bidder

Revel's continued marketing efforts paid off when it came to terms on September 5, 2014 with Polo North Country Club, an entity controlled by a Florida-based real estate developer. Under the proposed Asset Purchase Agreement, Polo North agreed to buy the Casino for $90 million and to serve as the "stalking horse" bidder at the upcoming auction. If Polo North lost at auction, it would receive $3 million as a break-up fee. If, however, Polo North walked away from the deal, it would surrender its $10 million deposit. The Bankruptcy Court approved Revel's request to modify the

---

[6] In connection with Revel's first bankruptcy case, IDEA likewise sought, among other things, essentially the same declaration. Am. Compl. ¶ 89(a), *IDEA Boardwalk, LLC v. Revel AC, Inc.*, No. 13-2013 (Bankr. D.N.J. May 30, 2014), ECF No. 7. In its answer, Revel "[d]enied" IDEA's allegation that it held a non-residential lease. *See* Answer ¶¶ 82–89, *IDEA Boardwalk, LLC v. Revel AC, Inc.*, No. 13-2013 (Bankr. D.N.J. June 13, 2014), ECF No. 8.

7

auction bid procedures to allow for the payment of the break-up fee and set a revised bid deadline for September 24, 2014. At the postponed auction, which ultimately took place on October 1, the highest bidder was not Polo North but Brookfield U.S. Holdings, LLC, as its $110 million bid topped the $94.5 million all-cash bid of Polo North. The Bankruptcy Court approved the sale to Brookfield on October 7.

Reentering the picture, IDEA argued that "it has the right under Section 365(h) of the [] Code to elect to remain in possession and[,] in that event, [Revel] [is] obligated to provide possession and rights appurtenant thereto," including "various easements for utilities and other services." Objection of IDEA Boardwalk, LLC ¶¶ 74, 77, *In re Revel AC, Inc.*, No. 14-22654 (Bankr. D.N.J. Oct. 13, 2014), ECF No. 754. IDEA also reaffirmed that, because it "has direct access to the boardwalk and the streets," it "can operate [its clubs] without impinging . . . [Revel's] possessory rights." *Id.* ¶ 78.

Before Revel could respond, Brookfield walked away from the deal, thus surrendering its $11 million deposit and bringing Polo North back into the fold as the back-up winning bidder. The Bankruptcy Court thereafter granted Revel's motion to terminate the sale to Brookfield and scheduled a hearing to approve the sale to Polo North.

## C. Revel Responds to IDEA at the 11th Hour

Late on the Friday night just three days before the January 5, 2015 sale hearing, Revel filed an "Omnibus Reply" to IDEA's objections. Regarding the latter's § 365(h) argument, Revel urged the Court to follow the Seventh Circuit's decision in *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537 (7th Cir. 2003), which held that

8

§ 365(h) doesn't disable § 363(f)'s authority to sell property subject to a lease free and clear of that lease and instead triggers only when a debtor seeks to reject a lease under § 365. *Id.* at 548. Revel also asserted that it could satisfy one of § 363(f)'s five conditions—namely, § 363(f)(4)—because a *bona fide* dispute exists with respect to the validity of IDEA's lease. According to Revel, though the form of its agreement with IDEA gives the appearance of a lease, because rent was "based entirely on a percentage of the revenue derived from" IDEA's operations, it was not a "true lease[] entitled to benefit from the applicable protections set forth in the Bankruptcy Code." Debtors' Omnibus Reply ¶ 20, *In re Revel AC, Inc.*, No. 14-22654 (Bankr. D.N.J. Jan. 2, 2015), ECF No. 1109.

### D. The Sale Hearing

At the sale hearing, the Bankruptcy Court considered the following legal issues: (1) whether sales of property under § 363(f) can wipe out a lessee's possessory interest under § 365(h); and (2) whether Revel introduced enough evidence to show that the validity of IDEA's lease was the subject of a *bona fide* dispute under § 363(f)(4), thus satisfying an eligibility requirement to invoke subsection (f).[7] Only if the

---

[7] The Bankruptcy Court did not address whether IDEA would receive adequate protection under 11 U.S.C. § 363(e) if the Casino were sold free and clear of its lease. Under that provision, where a tenant expects to lose its lease and asks for protection of its interest, "the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."

9

Court found in favor of Revel on each of these two issues could it sell the Casino free and clear of IDEA's lease.

On the first issue, the Bankruptcy Court pointed to a "split of authority": some courts hold that § 363(f) doesn't cut off a tenant's possessory rights under § 365(h), *see, e.g.*, *In re Zota Petroleums, LLC*, 482 B.R. 154, 163 (Bankr. E.D. Va. 2012), while others go another path to say that § 365(h) "says nothing at all about sales of estate property, which are the province of section 363," *Qualitech*, 327 F.3d at 547, the result in the latter case being that sales of property under § 363 can cut off the possessory interests of lessees under § 365. *See* Sale Hr'g Tr. 51:9-13, *In re Revel AC, Inc.*, No. 14-22654 (Bankr. D.N.J. Jan. 8, 2015), ECF No. 1175.

The second issue, the Bankruptcy Court conceded, presented "the more difficult" legal question: whether Revel had enough evidence to show that the validity of IDEA's lease was the subject of a *bona fide* dispute under § 363(f)(4). *Id.* at 52:21–22. The trouble was that Revel didn't provide the purportedly disputed lease to the Bankruptcy Court or much of anything to cloud its validity, though § 363(f) places the burden squarely on Revel's shoulders. *See id.* at 53:3–5 ("[Revel] didn't give me any of the leases . . . or any, really, evidence in support of its position of the bona[]fide dispute . . . ."). But, because of the need to push the sale through, the Court maintained that it "can't look at the result totally as to what the law requires," *id.* at 53:8, though, if time weren't of the essence, it "probably would have put [the hearing] off to have more evidence presented," *id.* at 55:12–13. With not much to go on, the Court concluded that, because IDEA (and the other tenants) were akin to "partners of [Revel's] enterprise," *id.* at 54:14–15, rather than mere tenants, Revel met its burden that "there is a bona[]fide issue in dispute" as to the leases, *id.* at 55:16–17. Hence the Court approved the sale and allowed Revel to sell its assets "free and clear of

10

existing tenancies and/or possessory rights, irrespective of any rights a tenant may hold under 11 U.S.C. § 365(h), including, but not limited to, all possessory rights." Sale Order ¶ 14, *In re Revel AC, Inc.*, No. 14-22654 (Bankr. D.N.J. Jan. 8, 2015), ECF No. 1138.

IDEA appealed that order and moved to stay the Court's decision pending appeal, noting the risk that, if the decision were not stayed, its appeal would be moot under 11 U.S.C. § 363(m) once the sale closed. That provision provides, in relevant part, that

> [t]he reversal or modification on appeal of an authorization . . . of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). In a one-paragraph order, the Bankruptcy Court denied IDEA's request. With its options dwindling and time winding down, IDEA filed an emergency motion before the District Court to stay the Bankruptcy Court's sale order.

### E. The District Court Denies IDEA's Stay Request

In considering whether to grant a stay pending appeal, courts consider the following four factors: (1) whether the appellant has made a strong showing of the likelihood of success on the merits; (2) will the appellant suffer irreparable injury absent a stay; (3) would a stay substantially harm other

11

parties with an interest in the litigation; and (4) whether a stay is in the public interest. *See, e.g., Republic of Phil. v. Westinghouse Electric Corp.*, 949 F.2d 653, 658 (3d Cir. 1991). Because IDEA is the only party before us, we limit our examination of the District Court's ruling to its treatment of IDEA's objections.

### 1. Likelihood of Success

On the first prong, the District Court maintained that IDEA needed to show that it had a "substantial" or "strong" case on appeal. *In re Revel AC, Inc.*, 525 B.R. 12, 24 (D.N.J. 2015) (internal quotation marks omitted). Addressing § 365(h) first, the Court noted that, because the legal issue was the subject of an "undisputed split of authority," IDEA at most showed a possibility and not a likelihood (which we understood the Court to mean more likely than not) of success. *Id.* (internal quotation marks omitted).

It next addressed whether the Bankruptcy Court clearly erred in finding that Revel put forth enough evidence to show that a *bona fide* dispute existed as to the validity of IDEA's lease. *See id.* at 26. Despite the Bankruptcy Court's failure to mention it, the District Court emphasized that "IDEA *specifically* sought a declaratory judgment concerning the nature of [its] agreement with [Revel]," *id.* at 29, even though, as IDEA asserted, its lawsuit "principally concerned [its] request for an energy easement, rather than an effort . . . to challenge the characterization of its Agreement," *id.* at 29 n.14. In the District Court's view, the pending litigation "arguably provide[d] *some* objective basis . . . to find . . . *some* bona fide issue in dispute," *id.* at 29 (emphases added), because, "in answering [the] complaint, [Revel] specifically denied that [the] Agreement constituted a lease," *id.* at 29 n.14. Consequently, the District Court concluded that IDEA

12

did not "demonstrate[] a likelihood of success on the merits" of the § 363(f)(4) issue either.  *Id.* at 30.[8]

### 2.  Irreparable Harm

On the irreparable-harm prong, the District Court considered whether IDEA had "demonstrated the potential for an actual and imminent, rather than remote or speculative, irreparable harm."  *Id.* at 31. IDEA posited that, absent a stay, if Revel and Polo North closed on the sale, this would render its claim statutorily moot under § 363(m), leading to the loss of its lease and the end of its business at the Casino.  In the

---

[8]  The District Court came to the same conclusion regarding whether Revel satisfied § 363(e)'s adequate protection requirement.  IDEA had argued that adequate protection means continued possession of its lease, not merely money damages, as the Code provides that "adequate protection may be provided by . . . granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property."  11 U.S.C. § 361(3).  But the Court thought otherwise, declaring that rejection damages were an adequate substitute for continued possession. *See In re Revel*, 525 B.R. at 31 (noting that "it is more than arguable that granting possession to [IDEA] in the present circumstances of a catastrophically failed casino-hotel concept would be no more 'adequate' than what [it] received, namely, the right to assert [a] claim[] for rejection damages or other relief as [an] unsecured creditor[]").  It also minimized the Bankruptcy Court's failure to make any findings on whether IDEA's interest would be adequately protected.  In the District Court's view, because the Bankruptcy Court found that § 363(f) was satisfied, it "necessarily found the interests of [the various tenants] adequately protected."  *Id.*

District Court's view, a mooted claim doesn't qualify as an irreparable injury nor does the potential loss of IDEA's possessory rights. *See id.* Regarding the latter, the Court noted that IDEA effectively had been dispossessed since September 2014 and would gain nothing by retaking possession of a space "in an empty and commercially-unproductive building." *Id.* at 32; *see also id.* at 31 ("[T]hough the [tenants] assert that the loss of their possessory rights would result in irreparable injury, [they] ignore that they have been without valuable possessory rights since September 2014."). Hence, as with the first prong, the Court held it did not weigh in IDEA's favor.

### 3. Harm to Others

For the third factor in the stay analysis, IDEA contended that, because it doesn't seek a stay of the sale itself but only the provision of the Sale Order that terminates its lease, Revel wouldn't be injured. The District Court, focusing only on the debtor (presumably because it was the only party opposing IDEA's stay motion), thought otherwise. In its view, because of the "easily terminable $10 million option [of Polo North] to purchase [Revel's] assets," there was a good chance it "would elect not to proceed with closing" if the Court granted the stay. *Id.* at 32 (internal quotation marks omitted). And "the palpable risk of losing a ready buyer," the Court maintained, "demonstrates . . . a risk of substantial harm to [Revel]." *Id.* (emphasis omitted); *see also id.* at 33 (describing Revel's exhaustive search for a buyer that yielded only two qualified buyers). Thus it found that the third factor weighed against a stay.

### 4. Public Interest

Finally, IDEA asserted that the public interest favors a stay because the public has a strong interest in the correct

application of bankruptcy law and the continuing operation of hospitality providers at Revel. Again the District Court disagreed. In its view, even assuming that IDEA expressed valid public policy concerns, "such concerns would not sufficiently outweigh the far more prevalent interest in facilitating the success of bankruptcy proceedings," *id.*, along with the "permanent loss of approximately 4,000 jobs" and "substantial detriment to the City of Atlantic City and [] surrounding areas" a failed sale could trigger, *id.* at 34 (internal quotation marks omitted). As with the first three factors, the public interest "favors the facilitation of the asset sale, and, accordingly, weighs against the imposition of a stay." *Id.*

IDEA appeals.

## II. JURISDICTION

Revel argues that we don't have jurisdiction to entertain IDEA's appeal from the District Court's stay denial under either 28 U.S.C. § 158(d)(1) or 28 U.S.C. § 1292(a)(1). We disagree. Subsection 158(d)(1) provides that "[t]he courts of appeals shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees" entered under subsections 158(a) and (b). Though a stay denial is not technically a final judgment, it is here in a practical sense because, under 11 U.S.C. § 363(m), the upshot of declining IDEA's stay request is to prevent it from obtaining a full airing of its issues on appeal and a decision on the merits, as that provision protects purchasers from any modification on appeal of an order authorizing a sale. Consequently, the District Court's decision denying IDEA's stay request was final for purposes of § 158(d)(1). *See In re Trans World Airlines, Inc.*, 18 F.3d 208, 215 (3d Cir. 1994) (acknowledging that "finality must be viewed more pragmatically in bankruptcy appeals under § 158(d) than in

15

other contexts"); *see also* James M. Grippando, *Circuit Court Review of Orders on Stays Pending Bankruptcy Appeals to U.S. District Courts or Appellate Panels*, 62 Am. Bankr. L.J. 353, 360 (1988) (arguing that "'finality' for purposes of section 158 is a fluid concept to be determined [on] a case by case basis").

Our decision in *Trans World Airlines* is not to the contrary. The question there was whether the District Court's *grant* of a stay was final for purposes of § 158(d). We held that it was not, "[e]ven under the most relaxed concept of finality," because the stay grant didn't "fully adjudicate a specific adversary proceeding between the parties." *In re Trans World Airlines*, 18 F.3d at 216. The difference here is that the District Court *denied* a stay, and the practical effect was to resolve IDEA's appeal on the merits, as the combination of the imminent closing of the sale and § 363(m) would have mooted its appeal.

Thus, where it is all but assured that a statute will render an appeal moot absent a stay, a stay denial is appealable under § 158(d)(1). We express no opinion on whether we have also have jurisdiction under 28 U.S.C. § 1292(a)(1)—*see generally In re Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1300 (7th Cir. 1997) (exercising jurisdiction over a stay denial under 28 U.S.C. § 1292(a)(1) because the District Court's order had "both the effect of an injunction and [] serious, perhaps irreparable, consequences" (quoting *Cent. States v. Cent. Cartage Co.*, 84 F.3d 988, 991 (7th Cir. 1996) (internal quotation marks omitted))—and leave for another day whether we have jurisdiction to review a stay denial where the underlying appeal could become equitably moot.

## III.    STANDARD OF REVIEW

At this juncture, only the District Court's denial of IDEA's stay request is at issue. We generally review appeals from a denial of a stay for abuse of discretion, *see Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175 (3d Cir. 1990), giving "proper regard to . . . [the District Court's] 'feel' of the case," *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1197 (2d Cir. 1971) (Friendly, J.) (citation omitted). However, we review *de novo* the District Court's decision on the likelihood of success, for it involves a purely legal determination. *See In re Forty-Eight Insulations*, 115 F.3d at 1301.

## IV.    ANALYSIS

Despite the growing importance of stays pending appeal, we have provided little direction on how to balance the four stay factors, mostly "[b]ecause this [C]ourt ordinarily grants or denies a stay pending appeal without opinion." *Westinghouse Electric Corp.*, 949 F.2d at 658. Despite its comprehensiveness, *Westinghouse* unfortunately shed little light on how to balance the four stay factors when not all of them point in the same direction. (The factors there all favored a stay denial.) We take this opportunity to provide guidance on how to conduct a balancing of the stay factors.

### A. The Sliding-Scale Approach to Balancing the Stay Factors

Under Federal Rule of Bankruptcy Procedure 8007, a party can move to stay the effect of a bankruptcy court order pending a resolution on appeal. *See* Fed. R. Bankr. P. 8007. The factors considered "overlap" the familiar ones courts look to in ruling on applications for preliminary injunctions. *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (observing that "similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action

17

has been conclusively determined"). To repeat essentially what was already noted above, the following factors come into play:

> (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). In order not to ignore the many gray shadings stay requests present, courts "balance[e] them all" and "consider the relative strength of the four factors." *Brady v. Nat'l Football League*, 640 F.3d 785, 789 (8th Cir. 2011) (quoting *Fargo Women's Health Org. v. Schafer*, 18 F.3d 526, 538 (8th Cir. 1994) (internal quotation marks omitted)); *see also* 16A Charles Alan Wright et al., *Federal Practice and Procedure* § 3954 (4th ed. 2008) ("The four factors should be balanced; thus, for example, if the balance of harms tips heavily enough in the stay applicant's favor then the showing of likelihood of success need not be as strong, and vice versa." (footnotes omitted)).

"[T]he most critical" factors, according to the Supreme Court, *Nken*, 556 U.S. at 434, are the first two: whether the stay movant has demonstrated (1) a strong showing of the likelihood of success and (2) that it will suffer irreparable harm—the latter referring to "harm that cannot be prevented or fully rectified" by a successful appeal, *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 386 (7th Cir. 1984) (Posner, J.). Though both are necessary, the former is arguably the more important piece of the stay analysis. As Judge Posner has remarked, it isn't enough that the failure to obtain a stay will be "a disaster" for the stay movant but only a "minor

18

inconvenience to the defendant," as "[e]quity jurisdiction exists only to remedy legal wrongs; [thus,] without some showing of a probable right[,] there is no basis for invoking it." *Id.* at 387.

Just how strong of a merits case must a stay applicant show? The "formulations used to describe the *degree* of likelihood of success that must be shown" vary widely. *Mohammed v. Reno*, 309 F.3d 95, 100 (2d Cir. 2002) (emphasis in original). To give but a sampling of the range that exists, some require a showing that the underlying appeal is "more likely to succeed than fail." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1026 (2d Cir. 1985) *overruled on other grounds by O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987). Others call for a "substantial possibility, although less than a likelihood, of success." *Dubose v. Pierce*, 761 F.2d 913, 920 (2d Cir. 1985)[9] (quoting *Hayes v. City Univ. of N.Y.*, 503 F. Supp. 946, 963 (S.D.N.Y 1980)) *vacated on other grounds* 108 S.Ct. 2890 (1988); *see also generally* John Y. Gotanda, *The Emerging Standards for Issuing Appellate Stays*, 45 Baylor L. Rev. 809, 813–15 (1993). For our Court, a sufficient degree of success for a strong showing exists if there is "a reasonable chance, or probability, of winning." *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc). Thus, while it "is not enough that the chance of success on the merits be 'better than negligible,'" *Nken*, 556 U.S. at 434 (citation omitted), the likelihood of winning on appeal need not be "more likely than not," *Singer Mgmt. Consultants*, 650 F.3d at 229; *see also Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (noting that the trouble

---

[9] Yes, we realize this is the same Circuit Court in the same year. Read on and realize that we are not immune from internal tensions in our opinions.

19

with a "strict 'probability' requirement is [] it leads to an exaggeratedly refined analysis of the merits at an early stage in the litigation").

On the second factor, the applicant must "demonstrate that irreparable injury is *likely* [not merely possible] in the absence of [a] [stay]." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in text). While a reference to "likelihood" of success on the merits has been interpreted by courts to cover the generic range of outcomes, for irreparable harm we understand the Supreme Court's use of "likely" to mean more apt to occur than not. *See generally Michigan v. U.S. Army Core of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011) (holding that for harm to be likely "there must be more than a mere possibility that harm will come to pass … but the alleged harm need not be occurring or be certain before a court may grant relief") (citation omitted).

"Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest." *Nken*, 556 U.S. at 435. We weigh the likely harm to the movant (absent a stay) (factor two) against the likely irreparable harm to the stay opponent(s) if the stay is granted (factor three). This is called the balancing of harms or balancing of equities. We also take into account where the public interest lies (factor four)—in effect, how a stay decision has "consequences beyond the immediate parties." *Roland Mach.*, 749 F.2d at 388.

In this context, a number of outcomes are possible. Where the balance of harms and public interest weigh in favor of a stay and the court deems that the stay movant has made a sufficient showing of success on appeal, a stay should be granted. Where the opposite is true—*i.e.*, the merits, balance of harms, and public interest favor the stay

20

opponent—a stay should be denied. Between these easy examples are the more difficult cases, such as "where the merits favor one party and the balance of harms favors the other." Gotanda, *supra*, at 821. There (along with the public interest) we must "evaluate the degree of irreparable injury with the prospects of prevailing on the merits." *Id*.

In deciding how strong a case a stay movant must show, we have viewed favorably what is often referred to as the "sliding-scale" approach. *See Constructors Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978); *Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917 (3d Cir. 1974). Under it, "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other [stay] factors.'" *Mohammed*, 309 F.3d at 101 (second alteration in original) (quoting *Wash. Metro.*, 559 F.2d at 843). Stated another way, "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in [its] favor; the less likely [it] is to win, the more need it weigh in [its] favor." *Roland Mach.*, 749 F.2d at 387. As we described in *Kreps* (in considering all four factors though in the context of deciding whether to grant a preliminary injunction),

> in a situation where factors of irreparable harm, interests of third parties and public considerations strongly favor the moving party, an injunction might be appropriate even though plaintiffs did not demonstrate as strong a likelihood of ultimate success as would generally be required. In contrast, where the threatened irreparable injury is limited or is balanced to a substantial degree by countervailing injuries which would result to third parties, or to the public interest from the issuance of an injunction, greater significance

21

must be placed upon the likelihood that the party will ultimately succeed on the merits of the litigation.

573 F.2d at 815 (footnotes omitted) (internal quotation marks omitted); *see In re A & F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014) ("As with a motion for a preliminary injunction, a 'sliding scale' approach applies; the greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor, and vice versa."); *Mohammed*, 309 F.3d at 101 ("The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff[] will suffer absent the stay. Simply stated, more of one excuses less of the other." (alteration in original) (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991).

Keeping in mind that the first two factors are the most critical, if "the chance of success on the merits [is only] better than negligible" and the "possibility of irreparable injury" is low, a stay movant's request fails. *Nken*, 556 U.S. at 434 (internal quotation marks omitted). Likewise, "even if a movant demonstrates irreparable harm that decidedly outweighs any potential harm to the [stay opponent] if a stay is granted, [it] is still required to show, at a minimum, 'serious questions going to the merits.'" *Mich. Coal. of Radioactive Material Users*, 945 F.2d at 153–54 (quoting *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)).

Our dissenting colleague criticizes the "sliding-scale" approach as "fail[ing] to honor" Third Circuit precedent. Dissenting Op. 1. In her view, there is no balancing—a court's consideration of a stay request is an all-or-nothing proposition. To merit a stay, she believes, the stay applicant

22

must "demonstrate," *id.*, that it will "satisfy," *id.* at 3, each of the four stay factors. If it doesn't, then, even if the stay applicant's chances of success on appeal are assured (let alone more probable than not) and the applicant will likely suffer an irreparable injury, a stay must be denied if, for example, it isn't in the public interest. That approach is not only impractical, it has the potential to be deeply unfair, and is one we have explicitly disavowed. In *Delaware River Port Authority v. Transamerican Trailer Transport*, for example, we couldn't have been clearer in establishing that "consideration of [the four] factors by the district court requires a 'delicate balancing.'" 501 F.2d at 920. We reaffirmed that concept in *Kreps* in observing that "no one aspect" of the stay analysis "will necessarily determine its outcome," 573 F.2d at 815, assuming, we pause to note, that the party seeking a stay has made a sufficient showing on the first two factors. Therefore, where the balance of harms and public interest "strongly favor[]" a stay, a court may enter it even if the applicant didn't "demonstrate as strong a likelihood of ultimate success as would generally be required." *Del. River Port Auth.*, 501 F.2d at 923. Relatedly, "when considerable injury will result from either the grant or denial of a preliminary injunction, these factors [*i.e.*, the balance of harms] to some extent cancel each other and greater significance must be placed upon the likelihood that each party will ultimately succeed on the merits of the litigation." *Id.* at 924. To the extent later statements in our opinions suggest the opposite—that "a complete failure to satisfy any one of [the stay] factors precludes a stay," Dissenting Op. 2—they are not binding. *See United States v. Rivera*, 365 F.3d 213, 213 (3d Cir. 2004) ("This Circuit has long held that if its cases conflict, the earlier is the controlling authority and the latter is ineffective as precedents.").

To sum up, all four stay factors are interconnected, and thus the analysis should proceed as follows. Did the applicant

23

make a sufficient showing that (a) it can win on the merits (significantly better than negligible but not greater than 50%) *and* (b) will suffer irreparable harm absent a stay? If it has, we "balance the relative harms considering all four factors using a 'sliding scale' approach. However, if the movant does not make the requisite showings on either of these [first] two factors, the [] inquiry into the balance of harms [and the public interest] is unnecessary, and the stay should be denied without further analysis." *In re Forty-Eight Insulations*, 115 F.3d at 1300–01 (internal citation omitted). But depending on how strong a case the stay movant has on the merits, a stay is permissible even if the balance of harms and public interest weigh against holding a ruling in abeyance pending appeal.

## B. Application

Because our assessment of how strong a case IDEA has is closely linked to the outcome of the balancing test, we begin with the test itself (though we write from the back-end first): the stronger the balance of harms and public interest is in IDEA's favor, the less a showing of potential success on appeal we demand (keeping in mind that the likelihood of success must be at least "a substantial case on the merits," *Hilton*, 481 U.S. at 778); the lesser the harms, the showing of success must be stronger.

### 1. Whom does the balance of harms and public interest favor?

To establish irreparable harm, a stay movant "must demonstrate an injury that is neither remote nor speculative, but actual and imminent." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989) (internal quotation marks omitted). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily

24

against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (internal quotation marks omitted); *see also* Gotanda, *supra*, at 814 (defining "irreparable injury" as "the harm [] the movant will suffer during the pendency of the litigation that cannot be prevented or fully rectified by the tribunal's final decision").

IDEA asserts that, absent a stay, its appeal will be batted out of court by § 363(m), rendering the continued operation of its business at the Casino impossible. As to potential money damages, IDEA continues, the most it will receive is pennies on the dollar, which grossly undervalues its lease (and the millions it invested in reliance of it). *See* IDEA Br. 41 (arguing that "a money judgment will not compensate [it] for [the] loss of its possessory rights under §[]365(h) because [Revel] [is] insolvent and, as a result, [has] no ability to provide payment on any claim [IDEA] may have"). For its part, Revel responds that IDEA's argument rests on a flawed assumption: that continued possession is substantially more valuable than the rejection damages it would receive. According to Revel (and the District Court), because Polo North would likely walk away from the sale if it were stayed, IDEA would be left with nothing but a possessory interest in a vacant building. *See In re Revel*, 525 B.R. at 32 ("[I]t is entirely logical that the absence of any occupant in the [] [C]asino would leave [IDEA] with, in essence, a possessory right in an empty and commercially-unproductive building.").

We do not accept that assertion. First, there is nothing in the record to refute IDEA's contention that it can operate independently of the Casino. Indeed, a principal purpose of its lawsuit against Revel was to confirm IDEA's right of access to a power source so that it can begin running its business again. *See* Oral Arg. Tr. 85:4–7 (noting that IDEA needed a utility easement "to continue to operate and work with the utility company"). We thus deem unsupportable the

25

suggestion of the District Court that, if Polo North walked away, IDEA would be left with "a possessory right in an empty and commercially-unproductive building." *In re Revel*, 525 B.R. at 32.

That still leaves us with the lingering question of whether rejection damages would sufficiently compensate IDEA for the loss of possession (and its business). On that question, we have previously observed that, though "a purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement … an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business." *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011) (citation and internal quotation marks omitted). That exception applies here. If we deny the stay, IDEA will lose not only its multi-million dollar investment but also the opportunity to operate what was, until the Casino closed, a profitable business. *See* Oral Arg. Tr. 100:12–18. In this context, IDEA shows sufficient irreparable injury to it absent a stay. Thus we turn to the harm to Revel (the only party who opposed IDEA's request for a stay)[10] and the public interest (the latter, in essence, balances the benefits and harms to the public if a stay is imposed and if it is not).

In assessing this side of the balance, the District Court credited Revel's "position that the issuance of [a] stay would present 'a real and substantial risk that Polo North would elect not to proceed with closing.'" *In re Revel*, 525 B.R. at

_____

[10] Polo North, though obviously having an interest in the outcome, took no significant role in advocating for or against a stay, and neither the Bankruptcy Court nor the District Court suggested that denying a stay would harm it, let alone cause irreparable harm.

26

32.  As it does on appeal, Revel's counsel had argued that even a limited stay would trigger bad things: Polo North walking away and Revel having to liquidate its assets under Chapter 7, which "not only would cause the permanent loss of approximately 4,000 jobs the [Casino] once provided, but also could cause substantial detriment to the City of Atlantic City and the surrounding areas, and possibly further hamper reorganization efforts at other casino resorts located in the city." Revel Br. 50.

In our view, the adequacy of the proof provided plays an important role "[i]n evaluating the harm that will occur depending upon whether or not [a] stay is granted." *Mich. Coal. of Radioactive Material Users*, 945 F.2d at 154. Absent some sort of declaration or other evidence in the record that a stay would cause substantial harm, the harm to Revel was at best speculative.  Note the context: Revel's counsel told the District Court that granting IDEA a stay only to prevent its lease from being extinguished would nonetheless spoil the entire sale.[11]  On the other hand, if IDEA lost its lease—a result a stay denial virtually guaranteed—its business at Revel's site would be permanently shuttered.  As a result, at the time of our ruling in February, the balance-of-harms tilted (at least moderately) in favor of IDEA.

---

[11]   As it turns out, a limited stay didn't set off the consequences Revel and Polo North said it would. Notwithstanding the limited stay we put into place on February 6, 2015, Revel and Polo North closed two months later on April 7. *See* Notice of Sale Closing, *In re Revel AC, Inc.*, No. 14-22654 (Bankr. D.N.J. Apr. 7, 2015), ECF No. 1553.

Does the public interest move the needle? We have doubts that it moves much. While the public certainly has an interest in saving jobs and helping Atlantic City's often sullied reputation, nothing before us indicates how many jobs will be brought back of the 4,000 lost, as we were not told what use Polo North intended for the sold assets. On the other side, the public has a stake in protecting the rights of tenants in commercial properties. Furthermore, public policy strongly favors the correct application of the Bankruptcy Code, especially where property rights are at stake. Overall, though the public has an interest in preventing both outcomes, we ultimately believe the short-term gain of some jobs in a facility that is operational in some way tilts slightly in Revel's favor.

In any event, our ultimate conclusion need not rest primarily on a rough estimation of whom the balance of harms and public interest favor. For, along with IDEA's sufficient showing of irreparable harm to it should a stay not be granted, success to it on the merits was assured. We explain why below.

> ### 2. Has IDEA made a strong showing of its likelihood of success on the merits?

IDEA makes three arguments before us on the merits, but we need address only one: whether the Bankruptcy and District Courts erred in holding that Revel met one of § 363(f)'s statutorily enumerated conditions to sell its assets free and clear. Revel contends they didn't err because IDEA twice sought to establish (via declaratory judgment actions) that it held a non-residential lease and Revel denied that IDEA had a lease. In Revel's view, this proves that a *bona fide* dispute exists under § 363(f)(4), as "a declaratory judgment is only proper when an actual 'case or controversy' exists." Revel Br. 34. We disagree yet again.

28

As an initial matter, the mere filing of a declaratory judgment action doesn't itself create a *bona fide* dispute under § 363(f)(4), even if Article III's "case or controversy" requirement has been met. The latter ensures only that the declaratory judgment plaintiff has standing and a redressable injury. Further, that IDEA alleged (and Revel denied) the former held a non-residential lease doesn't mean there was a *bona fide* dispute as to the validity of its lease. "Bona fide dispute" in the § 363(f)(4) context means that there is an objective basis—either in law or fact—to cast doubt on the validity of IDEA's purported lease. To satisfy that provision, Revel needed to show there was some factual or legal basis to deny that IDEA held a "true lease." But it did nothing of the sort.

First, a review of IDEA's complaint makes plain that its principal (and only) purpose was to invoke its rights under § 365(h) and "clarify its appurtenant rights for," among other things, "a utility easement," not to litigate the nature of its interest. Reply Br. 6; *see also* Oral Arg. Tr. 15:14–15 (counsel for IDEA noting that its suit was meant only to have the Court "declare and enforce [IDEA's] [] rights" under § 365(h)). The relevant paragraphs alleged the following:

> 125. [O]n or about May 12, 2012, [Revel] and IDEA . . . entered into a lease for nonresidential real property concerning certain premises at the Casino.
>
> 126. On August 28, 2014, [Revel] filed the Rejection Motion.
>
> 127. A hearing on the Rejection Motion is currently scheduled for October[]7, 2014.

29

> 128. If the Rejection Motion is granted, IDEA will have an opportunity to make an election under Section 365(h) of the Bankruptcy Code.
>
> 129. Section 365(h) . . . provides a lessee of real property under a rejected lease with the option of either retaining the estate, including, among other things, the continued right to possession or to treat the lease as terminated.
>
> 130. To the extent that IDEA elects to remain in possession, § 365(h) . . . allows it, despite rejection, to continue to enjoy its rights under such lease that are in or appurtenant to the real property, including the right to continued possession, utilities and necessary easements.
>
> Wherefore, [] IDEA seeks an order and judgment as follows:
>
> > a. Declaring that, despite rejection of the Lease, . . . IDEA may continue to enjoy its right under the Lease, including the right to continued possession, utility service and necessary easements; and
> >
> > b. Granting such other relief as is just.

Reply Br. 5–6 (emphasis omitted) (quoting Am. Compl. ¶¶ 125–30, *IDEA Boardwalk, LLC v. Revel Entm't Grp., LLC*, No. 14-01756 (Bankr. D.N.J. Sept. 26, 2014), ECF No. 6).

Moreover, even if IDEA had squarely put the validity of its lease at issue, nothing Revel said in response created an objective legal dispute. Revel's only argument was that its agreement with IDEA doesn't qualify as "a true lease"

30

because it "provides for 'rent' payments based entirely on a percentage of the revenue derived from [IDEA's operations]" and contains "numerous [] examples of provisions atypical of true leases." Mot. to Dismiss ¶ 31, *IDEA Boardwalk, LLC v. Revel Entm't Grp., LLC*, No. 14-01756 (Bankr. D.N.J. Oct. 13, 2014), ECF No. 8. Yet Revel failed to cite a single authority suggesting that a percentage-lease clause disqualifies a purported lease from being one.

To leave no doubt that a true lease exists, IDEA's agreement with Revel bars any argument to the contrary. It provides that

> [n]othing contained in this Lease shall be deemed or construed as creating the relationship of . . . partnership or joint venture between the parties hereto, it being understood and agreed that neither the method of computing rent, payment of the Tenant Fees nor any other provision contained herein nor any acts of the parties hereto shall be deemed to create any relationship between the parties other than that of Landlord and Tenant. The provisions of this Lease relating to the Percentage Rent payable hereunder are included solely for the purpose of providing a method whereby adequate rent is to be measured and ascertained.

Mot. to Dismiss Ex. A, at 56, *IDEA Boardwalk, LLC v. Revel Entm't Grp., LLC*, No. 14-01756 (Bankr. D.N.J. Oct. 13, 2014) (Section 21.12 of the Lease Agreement), ECF No. 8. The only conclusion from this is that any dispute regarding the validity of IDEA's lease was fanciful if not

disingenuous.[12]  As such, we part ways with the District Court's holding that IDEA's declaratory judgment request "provides some objective basis, at a minimum," of a "bona fide issue in dispute." *In re Revel*, 525 B.R. at 29.

Before we conclude, we would be remiss if we did not highlight the troubling consequences of Revel's argument.  If whenever a lessee attempts to invoke its rights under § 365(h) by asserting as a predicate that it holds a nonresidential lease,

---

[12]  Underscoring this is that, on June 24, 2015, the Bankruptcy Court, per another Judge, concluded that Revel's agreement with IDEA constitutes a "true lease" under New Jersey law and that § 365(h) protects its right "to remain in possession for the balance of the terms set forth in the Agreement[], and any renewal or extension period." *In re Revel AC, Inc.*, 532 B.R. 216, 227, 229 (Bankr. D.N.J. 2015). As to whether the agreement was a true lease, the Court said the following:

> [Polo North] places before the Court ample case law supporting the contention that a court must not be swayed by "form over substance" when determining the existence of a true lease. While this maxim is accurate, at some point form becomes substance.  We have reached that point.  The express terms of the Agreement[], together with supporting affidavits, make it clear that [Revel] and [IDEA] had the unequivocal intention of entering into true lease agreements.

*Id.* at 226.

32

every debtor would be well advised to file an answer denying that the lease exists. Revel's only response is that, by filing a declaratory judgment action, IDEA is "affirmatively alleging, subject to Rule 11, that there is a dispute as to that issue," as there needs to be "an actual case or controversy" in order to have a declaratory judgment action. Oral Arg. Tr. 70:10–17. That argument makes no sense. A declaratory judgment plaintiff does not fall afoul of Rule 11 by making an allegation in its complaint that it knows to be true. That rule comes into play only where a plaintiff files a complaint without basis in law or fact. Quite the opposite is what we have here.

## V.  Conclusion

The factors favoring a stay weigh solidly with IDEA. First, that it would prevail on the merits was all but assured because nothing in the record casts doubt on the validity of its lease with Revel, thus prohibiting the latter from invoking § 363(f) and selling its assets free of IDEA's lease. Second, IDEA demonstrated that, absent a stay, it would lose its club business at the Casino, and this was sufficient to show irreparable harm. On the balancing of harms, perhaps Revel could have tilted the balance in its favor with its own showing of irreparable harm, but it didn't come close, as it relied only on its counsel's hollow representations of harm rather than record evidence. Thus, while the public interest appears to favor a stay denial, that alone doesn't tip the four-factor balance in Revel's favor. We thus reverse and stay only the part of the Sale Order that allows Revel to sell the Casino free and clear of IDEA's lease.

33

SHWARTZ, <u>Circuit Judge</u>, dissenting.

Mindful of the deference we owe to the District Court under the applicable standard of review and the test for obtaining a stay, I part company with the Majority and would affirm the District Court's order denying IDEA's motion for a stay of the sale order pending appeal.[1]  First, I disagree with the Majority's new interpretation of the requirements for obtaining a stay.  Second, I conclude that the District Court thoroughly considered the entire record and all of the relevant factors and acted within its discretion when it held that the requirements to obtain a stay had not been satisfied.[2]

The Majority's "sliding scale" approach for obtaining such equitable relief fails to honor our precedent's conjunctive four-part test to obtain a stay and it would permit relief to be granted upon a particularly strong showing on just a single factor, apparently even if at least one factor weighs against the movant.  To obtain a stay pending appeal, a movant must demonstrate all four of the following elements: (1) that it is likely to succeed on the merits; (2) that irreparable harm will occur in the absence of a stay; (3) that granting the stay will not result in greater harm to other parties; and (4) that the public interest favors a stay.  <u>Hilton v.</u>

---

[1] As we must limit our review to the District Court's decision based on the facts it had before it at the time, I do not—and cannot—consider events that arose thereafter.

[2] Additionally, I would reach the issue of our jurisdiction under 28 U.S.C. § 1292(a)(1) and conclude that we do have jurisdiction under that statute.  <u>See</u> <u>Jackson v. Danberg</u>, 656 F.3d 157, 163 (3d Cir. 2011) (asserting appellate jurisdiction over the denial of a stay or injunction).

1

Braunskill, 481 U.S. 770, 776 (1987); <u>Jackson v. Danberg</u>, 656 F.3d 157, 162 (3d Cir. 2011); <u>Republic of Phil. v. Westinghouse Elec. Corp.</u>, 949 F.2d 653, 658 (3d Cir. 1991). Notwithstanding whatever extent to which these factors may be "balanced" against one another such that a relatively stronger showing on one may excuse a relatively weaker, but still extant, showing on another, a complete failure to satisfy any one of these factors precludes a stay.[3]  <u>See, e.g.</u>, <u>NutraSweet Co. v. Vit-Mar Enters. Inc.</u>, 176 F.3d 151, 153

---

[3] The Majority suggests that this Court has endorsed a sliding scale approach in <u>Constructors Association of Western Pennsylvania v. Kreps</u>, 573 F.2d 811 (3d Cir. 1978) and <u>Delaware River Port Authority v. Transamerican Trailer Transport, Inc.</u>, 501 F.2d 917 (3d Cir. 1974).  As noted in the text, however, this Court has repeatedly emphasized that all four factors must be independently satisfied to justify the grant of preliminary equitable relief, and the Supreme Court has presented the four-factor test as conjunctive, meaning that all four factors must be satisfied to obtain a stay.  <u>See, e.g.</u>, <u>Hilton</u>, 481 U.S. at 776.  Further, even to the extent that these cases can be read to embrace a "sliding scale" or "balancing" approach (which I do not necessarily view as equivalent), neither states or implies that a movant's complete failure to satisfy any of the four factors can be excused.  <u>See</u> <u>Kreps</u>, 573 F.2d at 815 (suggesting an injunction might be appropriate even where the movant "did not demonstrate <u>as strong</u> a likelihood of ultimate success as would generally be required" if each of the other factors "strongly favor[s] the moving party" (emphasis added)).  In my view, an essential prerequisite to "balancing" the factors is the requirement that proof of each factor be presented and hence can be placed on the scale.

(3d Cir. 1999) ("A plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate."); Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 192 (3d Cir. 1990) ("Only if the movant produces evidence sufficient to convince the trial judge that all four factors favor preliminary relief should the injunction issue."); ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987) (vacating preliminary injunction based on "dispositive" failure to satisfy one of the four factors).

Contrary to the Majority's assertion, requiring a movant to satisfy each factor is not unfair. Indeed, it is warranted. Equitable relief, including injunctions and stays, is an extraordinary remedy, Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008), and movants must accordingly meet a high bar to obtain it. Here, that means the movant must satisfy all four requirements to obtain a stay. See N.J. Hosp. Ass'n v. Waldman, 73 F.3d 509, 512-13 (3d Cir. 1995) (stating that an "injunction shall issue only if the plaintiff produces sufficient evidence to convince the district court that all four factors favor preliminary relief" (quoting Merchant & Evans, Inc. v. Roosevelt Bldg. Prods., 963 F.2d 628, 632-33 (3d Cir. 1992)). The Majority's test weakens this conjunctive test and makes it possible to, for example, obtain a stay or injunction simply because a party has made a strong showing on the merits, even though the harm that may befall it is compensable with money. This possibility is contrary to our precedent, which also requires an applicant seeking injunctive relief to show irreparable harm. Frank's GMC Truck Center, Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 & n.3 (3d Cir. 1987). Thus, the Majority's approach makes it more likely that what should be an extraordinary remedy will

3

be afforded on a more ordinary basis.[4]  For these reasons, we should not adopt the Majority's version of the sliding scale approach insofar as it excuses total failure to satisfy any one of the four factors, and we should continue to apply the four-factor test entrenched in binding precedent.  If proof of each factor is adduced, then a district court can and should carefully consider each factor, accord each the weight it believes appropriate in the particular case, and determine whether, on balance, the extraordinary relief sought should be granted.

That is exactly what the District Court did here.  The District Court carefully considered each of the factors and did not abuse its discretion in determining that none were satisfied.  First, the District Court astutely acknowledged that if the sale proceeded, IDEA would be no worse off than it was at the time it made its request for relief.  It was not clearly erroneous for the District Court to find, based on the facts before it, that IDEA was not conducting any business because Revel was closed, and that IDEA would be unable to conduct business if the sale fell through and Revel remained closed.[5]  It also was not clearly erroneous for the District Court to surmise that IDEA would likely not reopen its business if the sale proceeded, and thus that allowing the sale to proceed would cause it no additional harm.  Moreover, any

_____

[4] In fact, in this case, the Majority granted a stay even though it concluded that the public interest factor favored the non-movant, and thus the four-factor test was not met.

[5] The analysis might be different if the facility was accessible and the lessee was operating, in which case a sale free and clear of its interest could disrupt its business.  This, however, is not the case here.

4

injury to IDEA would be compensable with money.[6]  While collection may prove challenging, this hurdle is no different from that facing any other unsecured creditor.

Second, it was not clearly erroneous for the District Court to conclude that staying the sale would likely cause greater harm to others, including the estate and other creditors.  Each month without a sale generated millions of dollars in carrying costs to maintain the closed facility.  These expenditures depleted Revel's assets and the District Court correctly observed that a prompt sale would end these expenditures.  Moreover, the sale would provide an immediate opportunity to obtain assets for the estate, which it could then use to begin to repay its creditors.  Thus, it was reasonable for the District Court to conclude that a prompt sale would both preserve existing and generate additional estate assets, whereas staying the sale would continue to dissipate estate funds and, at a minimum, delay the collection of additional assets.  Given Revel's substantial challenges in finding a prospective buyer, it was far from idle speculation for Revel to fear that the loss of this buyer would significantly delay its ability to satisfy its creditors.  For these reasons, the District Court acted within its discretion in denying the stay,

---

[6] I recognize that, in exceptional circumstances, economic loss that threatens a movant's business can constitute irreparable harm sufficient to enjoin an action that poses such a threat, Minard Run Oil Co. v. U.S. Forest Serv., 670 F.3d 236, 255 (3d Cir. 2012), but no evidence was presented to show that the sale will cause such a loss.  This is not surprising because it was Revel's closing, and not its sale, that caused IDEA's inability to operate.

5

as a stay would likely cause greater harm to others than the absence of a stay would cause IDEA.[7]

Third, the District Court had a sound basis to conclude that granting the stay would not be in the public interest. As stated above, Revel faced difficulties securing a buyer, and having one in hand would certainly serve the public interest. At the time, it appeared that allowing the sale to proceed quickly would lead to the reopening of a large facility, which had employed (and would likely again employ) thousands of people. Thus, as even the Majority concedes, the sale presented the opportunity for numerous jobs in an economically depressed community. The District Court thus did not err in finding that denying the stay is in the public interest.

Finally, although the preceding analysis makes it unnecessary to reach this factor, I would hold that the District Court also appropriately concluded that IDEA did not demonstrate a strong likelihood of success on the merits, notwithstanding the Majority's assertion that success on the merits was "all but assured." Since the Majority has focused only on IDEA's argument that the Bankruptcy Court erred in

---

[7] Moreover, granting IDEA a stay would allow it to interfere with the orderly collection and distribution of assets and impact other creditors. IDEA is an unsecured creditor and, in the normal course, would have to await satisfaction of obligations to the secured creditors before it could be compensated. The stay would enable IDEA to catapult ahead of all other creditors, and place itself in a position to demand satisfaction before them.

6

holding that Revel met one of 11 U.S.C. § 363(f)'s conditions to sell its assets free and clear of IDEA's lease, I will likewise focus on this issue.

Under 11 U.S.C. § 363(e), an entity with "an interest in property" that is proposed to be sold can request the bankruptcy court to "prohibit or condition such . . . sale . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). The trustee, however, may sell the property "free and clear" if, among other things, "such interest is in bona fide dispute." 11 U.S.C. § 363(f)(4). The issue before the District Court was whether the record before it supported a finding that there was a bona fide dispute about whether IDEA had a leasehold interest in the space it occupied at Revel.

The Majority discounts the propriety of relying on IDEA's request for a declaratory judgment that it had a nonresidential lease as reflecting a bona fide dispute. While requesting a declaratory judgment alone does not automatically mean a bona fide dispute exists, the District Court here acted within its discretion to find a bona fide dispute existed based on the pleadings and the declaratory judgment IDEA sought. A declaratory judgment action asks a court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). When determining whether to exercise jurisdiction under § 2201, a district court is to consider, among other things, "the likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the controversy." Reifer v. Westport Ins. Corp., 751 F.3d 129, 140 (3d Cir. 2014) (internal quotation marks omitted). Thus, it is fair to

7

infer that, if a party seeks a declaratory judgment, it believes there is a dispute about a matter regarding which it seeks certainty. Here, IDEA wanted to secure relief under § 363(e). To do so, it needed a property interest. Aware that Revel may attempt to characterize IDEA's interest as a management agreement or partnership rather than a leasehold interest, it sought court intervention. These events provided the District Court with sufficient grounds to find that there was a strong likelihood that Revel would establish that there was a bona fide dispute about IDEA's interest in the property. While the Majority questions whether the dispute was indeed bona fide based upon the language of the lease agreement (and the Bankruptcy Court's finding months later concerning the lease), I cannot say that the District Court abused its discretion in relying on IDEA's own pleadings, which arguably conveyed its concern that Revel may dispute its interest.[8]

For these reasons, the District Court appropriately found that IDEA failed to satisfy any of the requirements needed to obtain a stay, and I would affirm the District Court's order denying the motion to stay the sale pending appeal.

---

[8] The Majority also notes that the Bankruptcy Court did not make explicit findings concerning the conditions needed to adequately protect IDEA's possessory interest. Even assuming that its analysis lacked precision, this alone does not mean that the District Court abused its discretion in denying the stay.

8